Jessica Y. Lee (CA SBN 282671)
NAPOLI BERN RIPKA SHKOLNIK, LLP
111 Corporate Drive, Suite 225
Ladera Ranch, California 92694
Telephone: (949) 234-6032
Facsimile: (949) 429-0892
JLee@napolibern.com

*Attorney for Removing Defendant Hunter J. Shkolnik*

FILED
CLERK, U.S. DISTRICT COURT

NOV 1 8 2013

CENTRAL DISTRICT OF CALIFORNIA
BY_____DEPUTY

DISTRICT COURT OF THE STATE OF CALIFORNIA
CENTRAL DISTRICT
WESTERN DIVISION

PETER R. LEFFE,

        Plaintiff,

        vs.

RHEINGOLD, VALET, RHEINGOLD,
SHKOLNIK & McCARTNEY LLP a.k.a.
RHEINGOLD, VALET, RHEINGOLD,
McCARTNEY & GIUFFRA LLP; PAUL D.
RHEINGOLD, an individual; THOMAS P.
VALET, an individual; DAVID B.
RHEINGOLD, an individual; HUNTER
SHKOLNIK, an individual; TERRENCE E.
McCARTNEY, an individual; THOMAS P.
GIUFFRA, an individual; and DOES 1 through
100,

        Defendants.

Case No. CV13-08513 -SJO
(JCx)

NOTICE OF REMOVAL TO FEDERAL
COURT

Complaint Filed: October 30, 2013

**TO:     THE CLERK OF THE COURT**

   **PLEASE TAKE NOTICE** that Defendant Hunter J. Shkolnik hereby removes the state court action described below to this Court. Removal is warranted under 28 U.S.C. §1441(b) because this is a civil action over which this Court has original jurisdiction under 28 U.S.C. §1332. In support of removal, Defendant Shkolnik states as follows:

## A. BACKGROUND

   1.  This action concerns claims relating to an purported contract ("Agreement")  allegedly entered into between Defendant, Rheingold, Valet, Rheingold, Shkolnik & McCartney, LLP and Plaintiff regarding the Plaintiff providing consulting and/or expert witness services for that Defendant in a certain product liability action.

   2.  Plaintiff alleges that the Defendants entered into the Agreement with the Plaintiff and failed to provide compensation for Plaintiff's services, as dictated under Agreement.

   3.  Plaintiff now brings suit not only against the corporate entity  which Plaintiff claims to have entered into the Agreement with, but improperly brings suit against various individuals, and a law firm that did not exist at the time the services allegedly were provided, and individuals involved in that entity.

## B. REMOVAL TO THIS JUDICIAL DISTRICT IS BOTH PROPER AND TIMELY

   4.  Plaintiff commenced this action in the Superior Court of the State of California ("Superior Court") on October 30, 2013.

5.   Pursuant to 28 U.S.C. §1446(b), the period for removal does not expire until thirty days after service[1] of the complaint. *See Murphy Bros v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999). Because this action is being removed prior to that time, the removal is timely.

6.   No further pleadings have been filed, and no proceedings have occurred in the Superior Court of the State of California for County of Los Angeles.

7.   Venue for removal is proper in the District Court of California, Central District-Western Division, because the Superior Court of California for the County of Los Angeles, where this suit was originally filed, is within the District Court of California, Central District-Western Division. *See* 28 U.S.C. §§1441(a), 1446(a).

8.   Removing Defendant, bases his removal upon federal question and diversity jurisdictional grounds pursuant to 28 U.S.C. §§1332, 1441 and 1446.

9.   Pursuant to 28 U.S.C. §1446(d), Defendants are filing written notice of this removal with the clerk of the Superior Court for the State of California, Los Angeles County. Copies of the Notice of Removal are also being served on Plaintiff's counsel pursuant to 28 U.S.C. §1446(d).

10. This Notice of Removal is filed subject to and with full reservation of rights, including but not limited to, defenses and objections to venue, improper service of process, and personal jurisdiction. No admission of fact, law or liability is intended by this Notice of Removal, and all defenses, motions and pleas are expressly reserved.

11. Wherefore, Defendant Shkolnik prays that this action be removed from the Superior Court of the State of California, County of Los Angeles to the United States District Court for the Central District of California, and for such further relief as may be just and proper.

---

[1] The Removing Party has not been served with the complaint.

NOTICE TO ADVERSE PARTY OF REMOVAL TO FEDERAL COURT

## C. **DIVERSITY JURISDICTION EXISTS**

10. There is diversity of citizenship in this action because the Defendants, and each of them, are diverse from the Plaintiff. Moreover, as show in Point D below, the matter in controversy exceeds $75,000, excluding interests and costs. Thus, this is a civil action over which this Court has original jurisdiction pursuant to 28 U.S.C. §1332(a).

11. Plaintiff Peter R. Leffe is, and was at the time this action was commenced, a citizen of the State of California.

12. Defendants Rheingold, Valet, Rheingold, Shkolnik & McCartney, LLP and Rheingold, Valet, Rheingold, McCartney & Giuffra LLP are, and were, at the time this action was commenced, a limited liability partnership formed under the laws of the State of New York.

13. Defendant Paul D. Rheingold is, and was at the time this action was commenced, a citizen of the State of New York.

14. Defendant Thomas P. Valet is, and was at the time this action was commenced, a citizen of the State of New York.

15. Defendant David B. Rheingold is, and was at the time this action was commenced, a citizen of the State of New York.

16. Defendant Hunter J. Shkolnik is, and was at the time this action was commenced, a citizen of the State of New York.

17. Defendant Terrence E. McCartney is, and was at the time this action was commenced, a citizen of the State of New York.

18. Defendant Thomas P. Giuffra is, and was at the time this action was commenced, a citizen of the State of New York.

19. Plaintiff has also named "Does 1 through 100" as defendants. Pursuant to 28 U.S.C. §1441(a), "the citizenship of defendants under fictitious names shall be disregarded" for

4

purposes of removal. Accordingly, the citizenship of the Does defendants may not be considered for diversity purposes.

20. Removing Defendant Shkolnik has not been advised that any other Defendant objects to this removal.

21. Therefore, because Plaintiff is a citizen of California and Defendants are all citizens of New York, there is complete diversity of citizenship in accordance with 28 U.S.C. §1332(a)(1).

22. Accordingly, the requisite complete diversity among the parties for federal diversity jurisdiction is satisfied.

### D. **THE AMOUNT IN CONTROVERSY EXCEEDS $75,000**

23. The amount in controversy in this case exceeds $75,000, excluding interest and costs.

24. Specifically, the Plaintiff asks for actual damages in the amount of $42,787.00; general damages in an unascertained amount; exemplary and punitive damages in an amount; and pursuant to Penal Code §496(c), treble damages, specifically, $128,361.00.

25. "In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977). Furthermore, "jurisdiction will be proper if 'it is facially apparent' from the complaint that the 'claims are likely above [$75,000]" *See Larremore v. Lykes Bros., Inc.*, No. 10-5166, 2011 WL 6221500 *1 (5th Cir. December 14, 2011) (quoting *Garcia v. Koch Oil Co. of Tex.*, 351 F.3d 636, 639 (5th Cir. 2003)).

26. It is facially apparently from even a cursory reading of Plaintiff's bare-boned complaint that the amount in controversy exceeds $75,000 excluding interest and costs.

27. For the foregoing reasons, this Court has original jurisdiction of this civil action pursuant to 28 U.S.C. §1332(a)(1), as this is a matter between citizens of different states with the amount

in controversy exceeding $75,000 exclusive interests and costs. Removal is proper under 28 U.S.C. §1441(a) because this Court has diversity jurisdiction.

### E.  FEDERAL QUESTION JURSIDICTION EXISTS PURSUANT

28. This action could have been originally filed in this Court pursuant to 28 U.S.C. §1331, on the basis of federal question jurisdiction.

29. This Complaint includes claims that are regulated, in part, upon federal law, specifically the federal Fair Debt Collection Practices Act. See 15 U.S.C. §1692. More specifically, Defendant Hunter J. Shkolnik is an individual who did not personally enter into an agreement with the Plaintiff. Taking the Complaint at face value, although it is clear the signature on the Agreement is a forgery, and the Plaintiff failed to execute the contract rendering it void and unenforceable, Plaintiff entered into an agreement to provide services to a law firm, Defendant Rheingold, Valet, Rheingold, Shkolnik & McCartney, rather than to Defendant Shkolnik or any of the other individuals named on a personal basis.

30. Under the federal Fair Debt Collection Practices Act, an individual is protected against a creditor using unfair, deceptive, or abusive means to collect a debt. Plaintiff's suit is inherently unfair and deceptive, as: (1) Defendant Shkolnik's signature is forged on the contract, and, (2) Plaintiff Leffe never executed the contract; and (3) Defendant Shkolnik never entered into any agreement with the Plaintiff where Defendant Shkolnik would be held personally liable. Plaintiff's suit is further abusive as it is unnecessarily harassing and meant to intimidate Mr. Shkolnik into paying Plaintiff a debt which Mr. Shkolnik does not personally owe by means of using false and defamatory claims of "Penal Theft", "Conversion" and "Embezzlement".

31. Plaintiff's right to relief, if any, depends upon the resolution of substantial federal questions related to whether Defendant Shkolnik is protected by the federal Fair Debt Collection Practices Act, thereby showing no liability on Mr. Shkolnik's part to the Plaintiff. Accordingly,

these claims are subject to this Court's federal questions jurisdiction as set forth by 28 U.S.C. §1331.

32. Supplemental jurisdiction exists with respect to any remaining claims pursuant to 28 U.S.C. §1367.

**WHEREFORE**, Defendants desire to remove this action to the United States District Court for the Central District of California, and hereby requests that the filing of this Notice of Removal shall effect the removal of this civil action to this Court.

Dated: November 18, 2013

Jessica Y. Lee
*Attorney for Removing Defendant Hunter J. Shkolnik*

NOTICE TO ADVERSE PARTY OF REMOVAL TO FEDERAL COURT

# EXHIBIT A

DAVID M. SHABY II SBN 97871
JOHN J. JACKMAN SBN 230169
DAVID M. SHABY & ASSOCIATES APC
11949 Jefferson Blvd., Suite 104
Culver City, California 90230

Tel: 310-827-7171
Fax: 310-822-8259

Attorney for Plaintiff ERICK CALDERON



**FILED**
Los Angeles Superior Court

**OCT 30 2013**

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
    SHAUNYA WESLEY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES-CENTRAL DISTRICT

| | |
|---|---|
| PETER R. LEFFE,<br><br>    Plaintiff,<br><br>vs.<br><br>RHEINGOLD, VALET, RHEINGOLD, SHKOLNIK & McCARTNEY LLP a.k.a. RHEINGOLD, VALET, RHEINGOLD, McCARTNEY & GIUFFRA LLP; PAUL D. RHEINGOLD an individual; THOMAS P.LET, an individual; DAVID B. RHEINGOLD, an individual; HUNTER SHKOLNIK, an individual; TERRENCE E. McCARTNEY, an individual; THOMAS P. GIUFFRA, an individual and DOES 1 through 100,<br><br>    Defendants. | Case No. **BC526169**<br><br>**COMPLAINT FOR DAMAGES**<br><br>1.  BREACH OF WRITTEN CONTRACT;<br>2.  ACCOUNT STATED;<br>3.  OPEN BOOK ACCOUNT;<br>4.  LABOR ERVICE AND MATERIALS;<br>5.  UNJUST ENRICHMENT;<br>6.  BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING;<br>7.  CONVERSION;<br>8.  EMBEZZLEMENT;<br>9.  CIVIL THEFT;<br>10. INTENTIONAL INTERFERENCE WITH PROSECTIVE ADVANTAGE;<br>11. NEGLIGENT INTERFERENCE WITH PROSECTIVE ADVANTAGE;<br>12. CONSTRUCTIVE TRUST.<br><br>*JURY TRIAL DEMANDED* |

COME NOW Plaintiff Peter R. Leffe to allege against Defendants, and each of them, as follows:

1

Complaint for Damages
Leffe v. Rheingold, Valet, Rheingold Shkolnik & McCartney LLP et.al.
Los Angeles County Superior Court Case #

## VENUE

1.      This action alleged herein is filed in this court because the wrongful conduct complained of herein occurred within the County of Los Angeles, State of California.  This court is the proper judicial district because the acts complained of occurred within the County of Los Angeles, State of California; Defendants and each of them at all relevant times conduct business in the County of Los Angeles, and City of Los Angeles; the acts complained of and which form the allegations of this complaint were performed within the County of Los Angeles and City of Los Angeles. Pursuant to the agreement attached herein as though fully set forth herein as Exhibit "A" the parties to the agreement for good and valuable consideration agreed that should any action be required to enforce the terms and conditions of the agreement, the action shall be filed in Los Angeles County, State of California.

## PARTIES

2.      Plaintiff PETER R. LEFFE, an individual (hereinafter "Plaintiff") is and at all times mentioned in this complaint was a resident of the State of California and owned property in the County of Los Angeles, California.

3.      Plaintiff is informed and believes and based thereon allege that defendant RHEINGOLD, VALET, RHEINGOLD, SHKOLNIK & McCARTNEY LLP (hereinafter " Defendant or collectively as Defendants") is, and at all relevant times mentioned in this complaint was an organization of unknown form conducting and doing business in Los Angeles County, California.

4.      Plaintiff is informed and believes and based thereon allege that defendant RHEINGOLD, VALET, RHEINGOLD, SHKOLNIK & McCARTNEY LLP also known as RHEINGOLD, VALET, RHEINGOLD, McCARTNEY & GIUFFRA LLP (hereinafter " Defendant or collectively as Defendants") is, and at all relevant times mentioned in this complaint was an organization of unknown form conducting and doing business in Los Angeles County, California. Plaintiff is informed and believes and based thereon alleges that defendant RHEINGOLD, VALET, RHEINGOLD, McCARTNEY & GIUFFRA LLP in some manner and form acquired the assets and liabilities of RHEINGOLD, VALET, RHEINGOLD, SHKOLNIK &

1    McCARTNEY LLP, including the liability alleged herein to the Plaintiff.

2        **5.**    At all relevant times alleged herein, Plaintiff is informed and believes, and thereon

3    allege that Defendant PAUL D. RHEINGOLD (hereinafter " PD Rheingold or collectively as

4    Defendants") is, and at all times mentioned herein held executive positions including but not limited

5    to officer, director shareholder or member of Defendants, and who were acting on behalf of

6    Defendants in the establishment of, or ratification of, the aforementioned practices and/or

7    policies of and for Defendant's RHEINGOLD, VALET, RHEINGOLD, SHKOLNIK &

8    McCARTNEY LLP also known as RHEINGOLD, VALET, RHEINGOLD, McCARTNEY &

9    GIUFFRA LLP, which included decision-making responsibility for, and or ratification of, and/or

10   establishment of business practices and policies for Defendants.

11       **6.**    At all relevant times alleged herein, Plaintiff is informed and believes, and thereon

12   allege that Defendant THOMAS P. VALET (hereinafter " Valet or collectively as Defendants") is,

13   and at all times mentioned herein held executive positions including but not limited to officer,

14   director shareholder or member of Defendants, and who were acting on behalf of Defendants in

15   the establishment of, or ratification of, the aforementioned practices and/or policies of and for

16   Defendant's RHEINGOLD, VALET, RHEINGOLD, SHKOLNIK & McCARTNEY LLP also

17   known as RHEINGOLD, VALET, RHEINGOLD, McCARTNEY & GIUFFRA LLP, which

18   included decision-making responsibility for, and or ratification of, and/or establishment of

19   business practices and policies for Defendants.

20       **7.**    At all relevant times alleged herein, Plaintiff is informed and believes, and thereon

21   allege that Defendant DAVID B. RHEINGOLD (hereinafter " DB Rheingold or collectively as

22   Defendants") is, and at all times mentioned herein held executive positions including but not limited

23   to officer, director shareholder or member of Defendants, and who were acting on behalf of

24   Defendants in the establishment of, or ratification of, the aforementioned practices and/or

25   policies of and for Defendant's RHEINGOLD, VALET, RHEINGOLD, SHKOLNIK &

26   McCARTNEY LLP also known as RHEINGOLD, VALET, RHEINGOLD, McCARTNEY &

27   GIUFFRA LLP, which included decision-making responsibility for, and or ratification of, and/or

28   establishment of business practices and policies for Defendants.

8.     At all relevant times alleged herein, Plaintiff is informed and believes, and thereon allege that Defendant HUNTER SHKOLNIK (hereinafter " Shkolnik or collectively as Defendants") is, and at all times mentioned herein held executive positions including but not limited to officer, director shareholder or member of Defendants, and who were acting on behalf of Defendants in the establishment of, or ratification of, the aforementioned practices and/or policies of and for Defendant's RHEINGOLD, VALET, RHEINGOLD, SHKOLNIK & McCARTNEY LLP also known as RHEINGOLD, VALET, RHEINGOLD, McCARTNEY & GIUFFRA LLP, which included decision-making responsibility for, and or ratification of, and/or establishment of business practices and policies for Defendants.

9.     At all relevant times alleged herein, Plaintiff is informed and believes, and thereon allege that Defendant TERRENCE E. McCARTNEY (hereinafter " McCartney or collectively as Defendants") is, and at all times mentioned herein held executive positions including but not limited to officer, director shareholder or member of Defendants, and who were acting on behalf of Defendants in the establishment of, or ratification of, the aforementioned practices and/or policies of and for Defendant's RHEINGOLD, VALET, RHEINGOLD, SHKOLNIK & McCARTNEY LLP also known as RHEINGOLD, VALET, RHEINGOLD, McCARTNEY & GIUFFRA LLP, which included decision-making responsibility for, and or ratification of, and/or establishment of business practices and policies for Defendants.

10.     At all relevant times alleged herein, Plaintiff is informed and believes, and thereon allege that Defendant THOMAS P. GIUFFRA (hereinafter " Guiffra or collectively as Defendants") is, and at all times mentioned herein held executive positions including but not limited to officer, director shareholder or member of Defendants, and who were acting on behalf of Defendants in the establishment of, or ratification of, the aforementioned practices and/or policies of and for Defendant's RHEINGOLD, VALET, RHEINGOLD, SHKOLNIK & McCARTNEY LLP also known as RHEINGOLD, VALET, RHEINGOLD, McCARTNEY & GIUFFRA LLP, which included decision-making responsibility for, and or ratification of, and/or establishment of business practices and policies for Defendants.

11.     Plaintiff is informed and believes and based thereon allege that Defendants DOES 1

through 100, inclusive, is sued in this complaint under fictitious names. Their true names and capacities are unknown to Plaintiff. When their names and capacities are ascertained, Plaintiff will amend this complaint by inserting their manes and capacities in this complaint. Plaintiff is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the wrongful conduct alleged.

12.   Plaintiff is informed and believe and based thereon allege that all of the Defendants, and each of them, at all times mentioned herein, were the agents, servants employees of the other defendants, and/or acting in conspiracy with the other defendants, and doing the acts or making the omissions referred to herein, were acting within the scope of sue agency, servitude or employment, and with the permission, knowledge and consent of each other defendant. Plaintiff is informed and believe and based thereon allege that each of the defendants ratified, approved and accepted the benefits of the acts of each of the remaining defendants with full knowledge of the nature and effect of such acts.

13.   As to each Defendant herein which is a corporation or business entity, Plaintiff is informed and believes and base thereon alleges that each of the acts hereinafter alleged were approved in advance, an subsequently ratified, by all of the managing agents, owners, partner, officers, and directors of each of said corporate and business entity defendants, and that the acts hereinafter alleged were undertaken by said corporate and business entity defendants pursuant to company policy.

14.   At all times mentioned                   herein Defendants and DOES 1 through 100 scheduled and arranged for the                   services and goods, operated the instruments of delivery; maintained those instruments of providing said services and delivery of goods; exercised control and oversight of the payments of Defendants accounts; exercised control and oversight of accounts receivable;  exercised control and oversight of expenditures and costs of operation of the business; and made decisions and directed the means of delivery of said services and goods in all conditions, including but not limited to financial and operational whether adverse or otherwise.

15.    Plaintiff is informed, believes, and thereon alleges that there exists such a unity of interest and ownership between Defendants, and DOES 1 through 100 that the individuality and separateness of said Defendants have ceased to exist.  The business affairs of said Defendants and each of them at all relevant times were and are so intertwined and intermingled that those affairs can not reasonable be segregated, and the same are inextricably intertwined.  Defendants and each of them are/were and at all relevant times used by DOES 1 through 100, as mere shells and conduits for the conduct of the certain of DOES 1 through 100's affairs.

16.    The recognition of the separate existence of Defendants and each of them and DOES 1 through 10, would not promote justice in that it would permit Defendants, and DOES 1 through 100, to insulate themselves from liability to Plaintiff.  Accordingly, Defendants and each of them and DOES 1 through 100 are alter egos of Defendants such that the fiction of their separate existence must be disregarded.

## FIRST CAUSE OF ACTION

### (Breach  Contract - Against all Defendants )

17.    Plaintiff re-alleges each allegation stated above, and incorporates said paragraphs as though fully set forth herein.

18.    On or about January 14, 2011, after such time as the Defendants and Plaintiff executed a agreement.  The agreement provided *inter alia* for the exclusive use of Plaintiff's services knowledge, investigation document review studies and research and consultation, trial preparation and expertise.  The terms of said agreement are attached to this pleading and marked as Exhibit "A."

19.    By reason thereof, under the terms and promises of the agreement and the law of the State of California, Plaintiff became entitled to receive from the agreement, the benefits due Plaintiff under the terms of the agreement.

20.    Plaintiff has performed all conditions of the agreement on Plaintiffs' part to be performed and in accordance with the terms and conditions of such agreement upon the

breach of the agreement by the Defendant, demanded of the Defendants due and timely

performance pursuant to the terms and conditions of the agreement.

21.     Plaintiff demanded payment of Defendants in the sum alleged in said

agreement, for all damages and losses sustained, but Defendants failed and refused to pay

Plaintiff the benefits to which Plaintiff were and are entitled to under the agreement, as stated

in the agreement.

22.     As a proximate result of the failure of Defendants to perform as promised,

Plaintiff has been damaged in the sum in excess of the minimum jurisdiction of this court,

together with interest thereon, for attorneys fees, costs, interest and expenses in being forced

to litigate his claims.

23.     That as a result of the conduct of Defendants, Plaintiff has suffered general

damages in an amount as of yet unknown and Plaintiff prays for leave to amend when the

amount is discovered.

## SECOND CAUSE OF ACTION

### (Accounts Stated- Against all Defendants)

24.     Plaintiff re-alleges each allegation stated above, and incorporates said

paragraphs as though fully set forth herein.

25.     With the last four years because an account was stated in writing by and between

Plaintiff and Defendants in which it was agreed that Defendants and each of them were

indebted to the Plaintiff.

26.     Plaintiff agreed to perform the services as directed by Defendants and

Defendants agreed to compensate and pay Plaintiff for those services and labor, pursuant to

an expressly agreed upon amount for each hour of services provided by the Plaintiff.

27.     Defendant promised upon demand to pay amount owed and Plaintiff made such

demand.

28.     Defendant has failed and refused to pay Plaintiff for his services as agreed to

herein above.

7
Complaint for Damages
Leffe v. Rheingold, Valet, Rheingold Shkolnik & McCartney LLP et.al.
Los Angeles County Superior Court Case #

29.     As a proximate result of the failure of Defendants to perform as promised, Plaintiff has been damaged in the sum in excess of the minimum jurisdiction of this court, together with interest thereon, for attorney's fees, costs, interest and expenses in being forced to litigate his claims.

30.     That as a result of the conduct of Defendants, Plaintiff has suffered general damages in an amount as of yet unknown and Plaintiff prays for leave to amend when the amount is discovered.

### THIRD CAUSE OF ACTION

### (Open Book Account- Against all Defendants )

31.     Plaintiff re-alleges each allegation stated above, and incorporates said paragraphs as though fully set forth herein.

32.     With the last four years on an open book account Defendants and each of them has become indebted to the Plaintiff based upon the agreement to perform certain services and labor as alleged herein above.

33.     Plaintiff agreed to perform the services as directed by Defendants and Defendants agreed to compensate and pay Plaintiff for those services and labor, pursuant to an expressly agreed upon amount for each hour of services provided by the Plaintiff.

34.     Defendant promised upon demand to pay amount owed and Plaintiff made such demand.

35.     Defendant has failed and refused to pay Plaintiff for his services as agreed to herein above.

36.     As a proximate result of the failure of Defendants to perform as promised, Plaintiff has been damaged in the sum in excess of the minimum jurisdiction of this court, together with interest thereon, for attorneys fees, costs, interest and expenses in being forced to litigate his claims.

37.     That as a result of the conduct of Defendants, Plaintiff has suffered general damages in an amount as of yet unknown and Plaintiff prays for leave to amend when the amount is discovered.

## FOURTH CAUSE OF ACTION

### (Labor Service and Materials- Against all Defendants )

38.     Plaintiff re-alleges each allegation stated above, and incorporates said paragraphs as though fully set forth herein.

39.     With the last four years on an agreement to provide labor service and materials Defendants and each of them has become indebted to the Plaintiff based upon the agreement to perform certain services and labor as alleged herein above.

40.     Plaintiff agreed to perform the labor services and provide materials as directed by Defendants and Defendants agreed to compensate and pay Plaintiff for those services and labor, pursuant to an expressly agreed upon amount for each hour of services provided by the Plaintiff.

41.     Defendant promised upon demand to pay amount owed and Plaintiff made such demand.

42.     Defendant has failed and refused to pay Plaintiff for his services as agreed to herein above.

43.     As a proximate result of the failure of Defendants to perform as promised, Plaintiff has been damaged in the sum in excess of the minimum jurisdiction of this court, together with interest thereon, for attorneys fees, costs, interest and expenses in being forced to litigate his claims.

44.     That as a result of the conduct of Defendants, Plaintiff has suffered general damages in an amount as of yet unknown and Plaintiff prays for leave to amend when the amount is discovered.

/ / /

/ / /

## FIFTH CAUSE OF ACTION

### (Unjust Enrichment - Against all Defendants)

**45.** Plaintiff re-alleges each allegation stated above, and incorporates said paragraphs as though fully set forth herein.

**46.** As alleged above, Plaintiff is informed and believes and upon said information and belief alleges that Defendants improperly failed and refused to and without authorization, from the Plaintiff to perform their obligations, for their own benefit and personal monetary gain.

**47.** Plaintiff is informed and believes and based thereon alleges that the aforesaid situation is unfair and inequitable. Defendants are overreaching, profiting unfairly and being unjustly enriched.

**48.** As a proximate result of the failure of Defendants to perform as promised, Plaintiff has been damaged in the sum in excess of the minimum jurisdiction of this court, together with interest thereon, for attorneys fees, costs, interest and expenses in being forced to litigate his claims.

**49.** That as a result of the conduct of Defendants, Plaintiff has suffered general damages in an amount as of yet unknown and Plaintiff prays for leave to amend when the amount is discovered.

**50.** As alleged above, Plaintiff is informed and believes and upon said information and belief alleges that if Defendants' said conduct was not intentional, it was negligent, and that Defendants were careless and oblivious to their duty to Plaintiff not to interfere with its business relations.

## SIXTH CAUSE OF ACTION

### (Breach of the Covenant of Good Faith and Fair Dealing
### - Against all Defendants )

**51.** Plaintiff re-alleges each allegation stated above, and incorporates said paragraphs as though fully set forth herein.

52.    There was implied in the agreement a covenant of good faith and fair dealing wherein Defendants impliedly covenanted that it would, in good faith and in the exercise of fair dealing, deal with the Plaintiff fairly and honestly and do nothing to impair, interfere with, hinder or potentially injure the rights of plaintiff to receive the benefits of said agreement. Defendants further accepted the duty to honor the obligations of the agreement to Plaintiff referred to herein.

53.    Defendants breached its covenant of good faith and fair dealing by its actions as stated herein above.  In addition, defendants' actions included; refusing to recognize and pay Plaintiff the benefits due Plaintiff pursuant to the provisions of the promises contained within the agreement.

54.    By reason of Defendants breach of the covenant of good faith and fair dealing, Plaintiff has been damaged financially, including expenses and fees incurred in the litigation, emotionally, and otherwise.

55.    That by said conduct, Plaintiff has been deprived the benefits of the agreement which he would have enjoyed except for the breach of the promise to perform by the Defendants.  Additionally, Plaintiff was forced to incur the use of his own funds for payments thereby losing interest on such funds.

56.    The breach by Defendants of the duty of good faith and fair dealing also has caused Plaintiff to incur general damages, including the infliction of mental anguish, distress and suffering, and additional attorney's fees, which has caused Plaintiff to become ill, nervous and upset to the detriment of Plaintiff's general health in an amount not yet ascertained.

## SEVENTH CAUSE OF ACTION
### (CONVERSION- Against all Defendants)

57.    Plaintiff re-alleges each allegation stated above, and incorporates said paragraphs as though fully set forth herein.

58.    On or about January 14, 2011, after such time as the Defendants and Plaintiff executed an agreement.  The agreement provided *inter alia* for the Plaintiff's services labor

1  and materials which included forty-two thousand seven hundred eighty seven

2  dollars United States currency.

3    **59.**    At all relevant times thereafter, Plaintiff was the owner of and entitled to

4  the proceeds of the agreement including forty-two thousand seven hundred eighty

5  seven dollars United States currency. Defendants and each of them were required to

6  return forty-two thousand seven hundred eighty seven dollars United States

7  currency to the Plaintiff.

8    **60.**    Plaintiff demanded return of the property, including forty-two thousand

9  seven hundred eighty seven dollars United States currency.  Defendants failed and

10  refused to return said the property including forty-two thousand seven hundred

11  eighty seven dollars United States currency.

12    **61.**    Plaintiff is informed and believes, and based thereon alleges that throughout

13  the past two-years Defendants and each of them have wrongfully converted Plaintiff's

14  property, including, but not necessarily limited to, forty-two thousand seven hundred

15  eighty seven dollars United States currency to Defendants' own use and pecuniary

16  benefit and to Plaintiff's damage.

17    **62.**    The exact amount of said damage is presently unknown to Plaintiff but

18  believed to be in excess of the jurisdictional amount of $25,000, and Plaintiff will

19  amend this pleading to allege the same when ascertained.

20    **63.**    Plaintiff is informed and believes, and based thereon alleges, that Defendants

21  converted the Goods for their own benefit intentionally, with malice, and oppressively.

22  Thus, Plaintiff is entitled to exemplary and punitive damages in an amount to be proven

23  at trial.

## EIGHTH CAUSE OF ACTION

### (EMBEZZLEMENT - Against all Defendants)

24    **64.**    Plaintiff re-alleges each allegation stated above, and incorporates said

25  paragraphs as though fully set forth herein.

65.     Defendants wrongfully and fraudulently appropriated the forty-two thousand seven hundred eighty. seven dollars United States currency after such forty-two thousand seven hundred eighty seven dollars United States currency had been entrusted to each of them as part of their regular course of their employment and job duties with Defendants.

66.     Plaintiff is informed and believes, and based thereon alleges, that Defendants appropriation of the forty-two thousand seven hundred eighty seven dollars United States currency amounts to embezzlement and misappropriation of Plaintiff's property.

67.     As a proximate result of Defendants' embezzlement of Plaintiff's property and the forty-two thousand seven hundred eighty seven dollars United States currency, Plaintiff has been damaged and injured as a result of Defendants' acts in an unknown amount in excess of the jurisdictional minimum of this Court, the exact amount of which shall be subject to proof at the time of trial.

68.     Plaintiff is informed and believes, and based thereon alleges, that Defendants used the embezzled and misappropriated forty-two thousand seven hundred eighty seven dollars United States currency for their own benefit, profit and monetary gain intentionally, with malice, and oppressively to the damage of Plaintiff. Thus, Plaintiff is entitled to exemplary and punitive damages.

## NINETH CAUSE OF ACTION
### (CIVIL THEFT - Against all Defendants)

69.     Plaintiff re-alleges each allegation stated above, and incorporates said paragraphs as though fully set forth herein.

70.     Defendants wrongfully and fraudulently appropriated the forty-two thousand seven hundred eighty seven dollars United States currency. After such time that the forty-two thousand seven hundred eighty seven dollars United States

currency had been entrusted to Defendant s, Defendants took the funds for their own personal use.

71.    As a result of the knowing acts of theft and receiving, withholding and concealing stolen property by Defendants, Plaintiff was damaged in an amount presently known, but no less than $25,000.

72.    Pursuant to Penal Code § 496(c), Plaintiff is are entitled to receive three times the amount of their actual damages as well as costs of suit and reasonable attorneys' fees.

## TENTH CAUSE OF ACTION
### (INTENTIONAL INTERFERENCE WITH PROSPECTIVE ADVANTAGE
### Against all Defendants)

73.    Plaintiff re-alleges each allegation stated above, and incorporates said paragraphs as though fully set forth herein.

74.    At all times herein concerned, Plaintiff had a prospective advantageous relationship with his clients andcustomers, and prospective customers. Plaintiff is informed and believes and upon such information and belief alleges that Defendants were aware of these relationships and intended, by their conduct, to intentionally and unjustifiably disrupt the same, and Defendants did so not only for their pecuniary gain but to injure and to damage Plaintiff.

75.    As a proximate result of the aforesaid alleged conduct of Defendants, Plaintiff was injured and damaged in that it was unable to provide his services labor expertise and materials use and/or sell to Plaintiff's vendors, customers and clients. The exact amount thereof is presently unknown to Plaintiff who will seek to amend this pleading when it is ascertained.

76.    The aforesaid alleged conduct of Defendants was willful, malicious, and intentional and Plaintiff is entitled to punitive damages as result thereof.

/ / /

## ELEVENTH CAUSE OF ACTION
## (NEGLIGENT INTERFERENCE WITH PROSPECTIVE ADVANTAGE
### Against all Defendants)

**77.** Plaintiff re-alleges each allegation stated above, and incorporates said paragraphs as though fully set forth herein.

**78.** By virtue of their relationship, Defendants owed a duty of care to Plaintiff not to interfere with his prospective business advantage with clients customers, and prospective customers.

**79.** At all times herein concerned, Plaintiff had a prospective advantageous relationship with clients customers, and prospective customers by reason of the business and services to be withheld as a result of the agreement executed by and between Plaintiff Defendants and each of them.

**80.** Plaintiff is informed and believes and upon such information and belief alleges that Defendants aware exclusivity of their agreement, and intended, by their conduct, to intentionally and unjustifiably disrupt the same, and Defendants did so not only for their pecuniary gain but to injure and to damage Plaintiff.

**81.** Plaintiff is informed and believes and upon such information and belief alleges that if Defendants' said conduct was not intentional, it was negligent, and that Defendants were careless and oblivious to their duty to Plaintiff not to interfere with its prospective business relations.

**82.** As a proximate result of the aforesaid alleged conduct of Defendants, Plaintiff was injured and damaged in that it was unable to use and/or sell services expertise labor and materials owned by Plaintiff to Plaintiff's vendors, customers and clients. The exact amount thereof is presently unknown to Plaintiff who will seek to amend this pleading when it is ascertained.

**83.** The aforesaid alleged conduct of Defendants was willful, malicious, and intentional and Plaintiff is entitled to punitive damages as result thereof.

## TWELFTH CAUSE OF ACTION

### (Constructive Trust - Against all Defendants)

84.     Plaintiff re-alleges each allegation stated above, and incorporates said paragraphs as though fully set forth herein.

85.     As alleged above, Plaintiff is informed and believes and upon said information and belief alleges that Defendants improperly failed and refused to perform under the agreement referred to herein, without authorization, from the Plaintiff for their own benefit and personal monetary gain.

86.     Plaintiff is informed and believes and based thereon alleges that the aforesaid situation is unfair and inequitable. Defendants are overreaching, profiting unfairly and being unjustly enriched.

87.     As alleged above, Plaintiff is informed and believes and upon said information and belief alleges that if Defendants' said conduct was not intentional, it was negligent, and that Defendants were careless and oblivious to their duty to Plaintiff not to interfere with its business relations.

**WHEREFORE,** Plaintiff prays for judgment as to each cause of action against Defendants, as follows:

1.  For general in excess of the jurisdictional amount and interest thereon in an amount to be proven at trial for all lost profits and damages caused by the conduct of Defendants;

2.  For special damages in excess of the jurisdictional amount in an amount to be proven at trial for damages caused by the conduct of Defendants;

3.  For punitive damages according to law in an amount sufficient to deter Defendants from such future wrongful conduct;

4.  For prejudgment interest;

5.  For attorneys' fees as allowed by law;

6.  For treble damages under Penal Code § 496(c);

7.  For costs of suit herein; and

8.  For such other and further relief as the Court may deem just and proper.

Dated: October 25, 2012

RESPECTFULLY SUBMITTED

By: _____

JOHN J. JACKMAN, ESQ.
Attorney for PETER R. LEFFE

Complaint for Damages
Leffe v. Rheingold, Valet, Rheingold Shkolnik & McCartney LLP et.al.
Los Angeles County Superior Court Case #

# Exhibit A

# Consulting Agreement

This agreement is entered into as of the dates set forth at the end of this Agreement by and between **PETER R. LEFFE** (hereinafter "Consultant") and **Rheingold, Valet, Rheingold, Shkolnik & McCartney LLP** (hereinafter "Rheingold").

Case name:  Lidle, et al  v.  Cirrus Design Corp.

Court case filed in:  U.S. District Court Southern District of New York

1. **RETENTION**
1.1 Consultant will be available to commence work for Client upon receipt of retainer described in article 4.4 below.
1.2 Consultant agrees not to work for any other person or party involved in this case on matters relating to this case for two weeks after he is verbally retained, or upon acceptance of the retainer set forth below. Should the two weeks lapse without receipt of retainer, Consultant is free to accept work from any other party.
2. **SERVICES TO BE PERFORMED**
2.1 Consultant agrees to perform consulting and/or expert witness services as requested by client and/or expert witness services as requested by Client and in connection with such services agrees to perform such investigation, document review, studies and research so as to be able to consult with Client and/or advise Client as an expert witness with respect to Consultant's findings. Consultant agrees to verbally report his facts, conclusions and findings to Client and, if desired by Client, Consultant will prepare a written report and cause it to be sent or delivered to client. Consultant also agrees to assist in trial preparation and to testify as an expert witness in those areas in which he is qualified.
2.2 The full scope of Consultant's work will be determined as the matter proceeds, and will be subject to the needs and requests of Client. Consultant and Client agree that Consultant will be performing services to this Agreement as an Independent Contractor.
2.3 Upon request, Consultant will provide an estimate of the time and costs it will take to perform the work outlined by the Client. If it becomes apparent to Consultant that he will need to exceed the estimates provided to complete his work, he will provide the Client with a revised estimate and shall proceed only after being granted permission by Client.
3. **CONFIDENTIALITY**
3.1 Consultant agrees to retain all non-public information obtained from Client as confidential and agrees not to release or discuss any of such information unless Consultant has obtained the prior consent of Client or is otherwise forced, compelled, or required to disclose this information by operation of law or applicable government authority.

1

**4.   COMPENSATION**

4.1 Fees are billed to the Client by the tenth of an hour with a minimum charge of .2 of an hour as follows:

4.2 Travel time within 100 miles of the Consultants place of business shall be billed at the **regular hourly rate**.  Travel beyond 100 miles and air travel shall be billed at half the normal hourly rate of Consultant as set forth below.

4.3 When in the **local area** away from the Consultant's office, time is billed from the time of departure from Consultant's office until the time of return.

4.4 Each full day **away from the local area** on assignment is billed on the basis of an eight hour day.  Where more than eight hours work or travel is performed in one day, the actual time is billed.  Day of departure and day of return are prorated.

4.5 All work with the exception of trial and deposition testimony including but not limited to research, report preparation and telephone calls, **THREE HUNDERD dollars ($300) per hour.**

4.6 Testimony at deposition at **FOUR HUNDRED AND FIFTY dollars per hour**. A two hour minimum shall apply.

4.7 Trial testimony at **FOUR THOUSAND dollars ($4,000) per day.**

4.8 A retainer of **Ten Thousand dollars ($10,000)** is charged for this case.  This amount is a non-refundable minimum fee charged.  Billings for services performed or expenses incurred will be charged against the retainer until such time as it is exhausted.  Retainer has been paid by Macaluso & Associates, APC

4.9 Permission to use Consultant's name or in any way indicate that he is an expert witness or Consultant for Client's side of the case, either informally or formally with other parties, is **not granted until the retainer has been paid.**

4.10 Notwithstanding the Agreement of Consultant to be bill Client at an hourly rate in  one tenth of an hour increments for services performed, the following minimum fees will be due, whether or not Consultant is required to spend the amount of time necessary to result in these minimum fees if time was charged on an hourly basis.  The minimum fees and types of services exclusive of travel to which they apply are as follows:

    1.   Attendance at a deposition either to assist client or to testify as an expert witness - $1,000

    2.   Attendance at court to assist Client, testify as an expert witness, or while waiting at court for an opportunity to testify or assist Client in Court - $1,000

    3.   The above are minimum billings and if actual time spent results in an amount due which exceeds these minimums, then the actual amount will be due.

4.11 Fees and rates, once established for a job, will not be increased for the job even though fees or rates may increase for new jobs for a period of one year. Twelve months after being retained, fees many be raised to those currently charged other Clients at the time but shall not exceed a 10% per year increase.

2

5.  **EXPENSES**

5.1 Travel and miscellaneous expenses, are charged at cost plus ten percent. Travel by care is at the rate of fifty cents a mile. No travel expense is charged in the local area, although time is charged.

5.2 Travel will be performed by the most economical means compatible with the Client's time constraints except that Economy Plus or next higher class above economy shall be used for all flights of more than two hours duration including cumulative time where connecting flights are required.

5.3 Client may avoid the 10% surcharge on expenses by furnishing travel and lodging which is billed directly to Client by the carrier or hotel.

6.  **BILLINGS**

6.1 Invoices will be tendered after the end of each month. A detailed breakdown is furnished itemizing each charge for the month. Billings from the previous month not paid will be noted as, "Previous Balance". Payment made out to **Peter R. Leffe, Mechanical Engineer and Architect** is due 28 days after the invoice date. Late charges at the rate of 1.5% per month will be added to bills not paid within 30 days.

6.2 The payment of all fees and expenses is the responsibility of the Client notwithstanding Client's relationship with third parties, contingency arrangements, subrogation, etc. As a convenience, Consultant may agree to prepare separate billing for an attorney taking Consultant's deposition, but the responsibility for payment remains that of the Client. Failure to include a chargeable item in one billing shall not constitute a waiver of the right to assess the charges in a subsequent billing.

6.3 Questions concerning specific billings are welcomed and requests for corrections must be submitted within 30 days after date of billing in question.

7.  **TERMINATION**

7.1 The parties agree that any action which is required to be filed to enforce the terms of this Agreement shall be filed in Los Angeles County, State of California but this shall not prelude either party from bringing an action in any other county which represents the proper venue for such action.

7.2 In the event that either party is required to retain the services of an attorney to enforce the provisions of this Agreement, then in such case the Client agrees to pay reasonable attorney's fees and all costs and expenses incurred by Consultant including collections costs, provided that Consultant is the prevailing party in said matter either by settlement, litigation or otherwise.

8.  **GOVERNING LAW**

8.1 All actions arising out of the performance of this Agreement shall be governed by the laws of the State of California.

9. This is a continuation agreement. Rheingold agrees to pay all past due amount that have been charged to any other party regarding services of Consultant in this matter. Any pass through agreement Rheingold may have with any other entity will have no effect on this agreement and Rheingold shall be solely responsible for all compensation to Consultant and any past due amounts, due consultant in this case from the date that Consultant first started work on this matter as well as any future billing.

The parties do hereby execute this Agreement at the places set forth below and on the date set forth below.

_____Date:_____ Malibu, California
Peter R. Leffe, Consultant

_____Date: 01/14/2011 Location: New York, New York
Signature          Client

Hunter Shkolnik, Esq.
For: Rheingold, Valet, Rheingold, Shkolnik & McCartney LLP

4

CM-010

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*<br>— John J. Jackman SBN 230169<br>David . Shaby & Associates APC<br>11949 Jefferson Blvd., Suite 104<br>Culver City, CA 90230<br>TELEPHONE NO.: 310-827-7171    FAX NO.: 310-822-8529<br>ATTORNEY FOR *(Name):* Peter R. Leffe | **FOR COURT USE ONLY**<br>**FILED**<br>Los Angeles Superior Court<br>**OCT 30 2013**<br>John A. Clarke, Executive Officer/Clerk<br>By _____, Deputy<br>SHAUNYA WESLEY |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles 90012
BRANCH NAME: Central District-Stanley Mosk Courthouse

CASE NAME:
Leffe v. Rheingold, Valet, Rheingold, Shkolnik & McCartney LLP et.al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [✓] Unlimited    [ ] Limited<br>(Amount          (Amount<br>demanded       demanded is<br>exceeds $25,000)  $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | BC 526169<br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[✓] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [✓] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [✓] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [✓] punitive

4. Number of causes of action *(specify):*  Twelve

5. This case [ ] is [✓] is not   a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: October 23, 2013

John J. Jackman
_____          _____
(TYPE OR PRINT NAME)                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

| SHORT TITLE: Leffe v. Rheingold, Valet Rheingold, Shkolnik & McCartney LLP | CASE NUMBER |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

> **This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

**Item I**. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES    CLASS ACTION? ☐ YES  LIMITED CASE? ☐ YES  TIME ESTIMATED FOR TRIAL 3-5 ☐ HOURS/ ☑ DAYS

**Item II**. Indicate the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.

> **Applicable Reasons for Choosing Courthouse Location (see Column C below)**

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| Other Personal Injury/ Property Damage/ Wrongful Death Tort (23) | Asbestos (04) | ☐ A6070  Asbestos Property Damage<br>☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2.<br>2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons<br>☐ A7240  Other Professional Health Care Malpractice | 1., 4.<br>1., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | ☐ A7250  Premises Liability (e.g., slip and fall)<br>☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270  Intentional Infliction of Emotional Distress<br>☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 4.<br>1., 4.<br>1., 3.<br>1., 4. |

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 1 of 4

| SHORT TITLE: Leffe v. Rheingold, Valet Rheingold, Shkolnik & McCartney LLP | CASE NUMBER |
|---|---|

| **A**<br>Civil Case Cover Sheet Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | | |
| Business Tort (07) | ☑ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
|  | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | | |
| Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
|  | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | | |
| Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2., 5. |
|  | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
|  | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
|  | ☑ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
|  | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| Other Contract (37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
|  | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
|  | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | | |
| Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2. |
| Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
|  | ☐ A6032  Quiet Title | 2., 6. |
|  | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | | |
| Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

| SHORT TITLE: Leffe v. Rheingold, Valet Rheingold, Shkolnik & McCartney LLP | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus<br>☐ A6152  Writ - Mandamus on Limited Court Case Matter<br>☐ A6153  Writ - Other Limited Court Case Review | 2., 8.<br>2.<br>2. |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment<br>☐ A6160  Abstract of Judgment<br>☐ A6107  Confession of Judgment (non-domestic relations)<br>☐ A6140  Administrative Agency Award (not unpaid taxes)<br>☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112  Other Enforcement of Judgment Case | 2., 9.<br>2., 6.<br>2., 9.<br>2., 8.<br>2., 8.<br>2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only<br>☐ A6040  Injunctive Relief Only (not domestic/harassment)<br>☐ A6011  Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8.<br>2., 8.<br>1., 2., 8.<br>1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment<br>☐ A6123  Workplace Harassment<br>☐ A6124  Elder/Dependent Adult Abuse Case<br>☐ A6190  Election Contest<br>☐ A6110  Petition for Change of Name<br>☐ A6170  Petition for Relief from Late Claim Law<br>☐ A6100  Other Civil Petition | 2., 3., 9.<br>2., 3., 9.<br>2., 3., 9.<br>2.<br>2., 7.<br>2., 3., 4., 8.<br>2., 9. |

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 3 of 4

| SHORT TITLE: Leffe v. Rheingold, Valet Rheingold, Shkolnik & McCartney LLP | CASE NUMBER |
|---|---|

**Item III.** Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON:  Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case.<br><br>☐1. ☑2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS:<br>18346 Wakecrest Drive |
|---|---|
| CITY: Malibu | STATE: CA | ZIP CODE: 90265 | |

**Item IV.** *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the ___Stanley Mosk___ courthouse in the ___Central___ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: __10-23-2013__

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1.  Original Complaint or Petition.

2.  If filing a Complaint, a completed Summons form for issuance by the Clerk.

3.  Civil Case Cover Sheet, Judicial Council form CM-010.

4.  Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).

5.  Payment in full of the filing fee, unless fees have been waived.

6.  A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7.  Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 4 of 4

# EXHIBIT B

Case 2:13-cv-08513-SJO-JC Document 1 Filed 11/18/13 Page 37 of 64 Page ID #:39

Larremore v. Lykes Bros. Inc., 454 Fed.Appx. 305 (2011)

454 Fed.Appx. 305
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See
also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.
(Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

Brian LARREMORE; Jean
Larremore, Plaintiffs–Appellants
v.
LYKES BROTHERS INC, Defendant–Appellee.

No. 10–51166.    |    Dec. 14, 2011.

**Synopsis**
**Background:** After the United States District Court for the Western District of Texas entered judgment enforcing a mediation agreement that settled a property boundary dispute between two landowners, plaintiff landowner appealed.

**Holding:** The Court of Appeals held that amount in controversy, for purposes of court's subject matter jurisdiction, was unclear.

Remanded.

West Headnotes (1)

**[1]**    **Federal Courts**
👉 Further evidence, findings or conclusions

Remand was necessary to determine court's subject matter jurisdiction over property dispute which had been filed in state court by landowner seeking declaratory and injunctive relief, and then removed to federal court by defendant, since it was not clear that amount in controversy exceeded jurisdictional requirement; it was not facially apparent from complaint, which stated in conclusory manner that "value of the plaintiff's

acreage exceeds $75,000," and defendant had failed to support federal jurisdiction by setting forth facts in removal petition or by affidavit that supported requisite amount. 28 U.S.C.A. § 1332(a).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*306**  James Steven Hershberger, Midland, TX, Jennie Beth Fannin, Alpine, TX, for Plaintiffs–Appellants.

Patricia Long Weaver, Esq., Janet R. Pritchett, Stubbeman, McRae, Sealy, Laughlin & Browder, Inc., Midland, TX, for Defendant–Appellee.

Appeal from the United States District Court for the Western District of Texas, USDC No. 4:08–CV–21.

Before BENAVIDES, PRADO, and GRAVES, Circuit Judges.

**Opinion**

PER CURIAM: [*]

In this diversity jurisdiction case, Brian and Jean Larremore challenge the district court's judgment enforcing a mediation agreement that settled a property boundary dispute between the Larremores and Lykes Brothers, Inc. ("Lykes"). Although the parties never objected to jurisdiction, we asked for supplemental briefing on whether Lykes met its burden as the removing defendant to " 'prove by a preponderance of the evidence that the amount in controversy exceeds' the jurisdictional amount." Garcia v. Koch Oil Co. of Tex., 351 F.3d 636, 638–39 (5th Cir.2003) (quoting De Aguilar v. Boeing Co., 11 F.3d 55, 58 (5th Cir.1993)). We find that the record is insufficiently developed with respect to the amount in controversy, and we remand for the limited purpose of determining whether the amount in controversy exceeds $75,000.

The Larremores filed suit against Lykes in Texas state court seeking declaratory and injunctive relief in an attempt to settle a dispute over property boundaries and obtain an easement across Lykes's property. Lykes removed the suit to the United States District Court for the Western District

Larremore v. Lykes Bros. Inc., 454 Fed.Appx. 305 (2011)

Case 2:13-cv-08513-SJO-JC   Document 1   Filed 11/18/13   Page 38 of 64   Page ID #:40

of Texas, invoking diversity jurisdiction. In the notice of removal, Lykes alleged that:

> The amount in controversy exceeds $75,000, excluding interest, costs, and attorney fees. 28 U.S.C. § 1332(a). Plaintiffs have sued for a an [sic] easement for egress and ingress to real property they own in Brewster County, Texas totaling 2507.05 acres. In paragraph 44 of their petition, the plaintiffs claim that "without an easement for egress and ingress Plaintiff's land will be rendered valueless." The value of the plaintiff's acreage exceeds $75,000.

Lykes did not attach any evidence to the notice of removal other than the Larremores' original state court complaint, which also did not allege any specific value of the claims at issue. The Larremores did not object to the removal and the issue of subject matter jurisdiction was not considered below. Similarly, the parties did not raise jurisdiction as an issue on appeal.

"Although neither party raises the issue of subject matter jurisdiction, this court must consider jurisdiction *sua sponte*." *EEOC v. Agro Distrib., LLC,* 555 F.3d 462, 467 (5th Cir.2009) (citation omitted). As stated, the party seeking to invoke federal diversity jurisdiction has the burden to prove that the amount in controversy exceeds the jurisdictional amount. *Garcia,* 351 F.3d at 638; *see also* 28 U.S.C. § 1332(a) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs."). That burden may be satisfied in either of two ways. **\*307** *Garcia,* 351 F.3d at 639. First, jurisdiction will be proper if "it is facially apparent" from the complaint that the "claims are likely above [$75,000]." *Id.* (citation omitted). "If the value of the claims is not apparent, then the defendants may support federal jurisdiction by setting forth the facts—[either] in the removal petition [or] by affidavit—that support a finding of the requisite amount." *Id.* (internal quotation marks and citation omitted). "[R]emoval 'cannot be based simply upon conclusory allegations.' " *Felton v. Greyhound Lines, Inc.,* 324 F.3d 771, 774 (5th Cir.2003) (quoting *Allen v. R & H Oil & Gas Co.,* 63 F.3d 1326, 1335 (5th Cir.1995)). Here, the Larremores did not seek any specific amount of damages in their original state court complaint. Rather, they

sought declaratory and injunctive relief that would ultimately establish an easement over Lykes's property. "In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 347, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Garcia,* 351 F.3d at 640 (quoting *Hunt* ).

Due to the incomplete nature of the factual record, we cannot determine if the amount in controversy exceeds the jurisdictional requirement. Given the extent of the property in this case, we think that a remand for development of the record and determination of jurisdiction is appropriate. *See U.S. ex rel. Miss. Road Supply Co. v. H.R. Morgan, Inc.,* 528 F.2d 986, 986 (5th Cir.1976) (per curiam) (remanding to district to develop record and determine subject matter jurisdiction); *Airline Maint. Lodge 702 v. Loudermilk,* 426 F.2d 802, 802 (5th Cir.1970) (per curiam) (vacating judgment and remanding for determination of jurisdiction because "of the inadequacy of the briefs of both parties"); *see also Valdez v. Allstate Ins. Co.,* 372 F.3d 1115, 1117–118 (9th Cir.2004) (remanding to district court to determine if amount in controversy is met); *Samuel–Bassett v. KIA Motors Am., Inc.,* 357 F.3d 392, 403 (3d Cir.2004) (same); *Williams v. Best Buy Co.,* 269 F.3d 1316, 1321 (11th Cir.2001) (same). Although ultimately the district court might find that there is not jurisdiction, a remand will at least allow this determination to be made with a complete factual record, a record which was never developed because the parties never litigated the merits below and never objected to jurisdiction. *See Mehlenbacher v. Akzo Nobel Salt, Inc.,* 216 F.3d 291, 298–99 (2d Cir.2000) (remanding for determination of amount in controversy and stating that in some cases it is unfair to dismiss based on jurisdiction where opportunity was not given to develop record in district court). We therefore REMAND for the limited purpose of determining whether the amount in controversy exceeds $75,000.

REMANDED.

## Parallel Citations

2011 WL 6221500 (C.A.5 (Tex.))

Footnotes

\*   Pursuant to FIFTH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in FIFTH CIR. R. 47.5.4.

Larremore v. Lykes Bros. Inc., 454 Fed.Appx. 305 (2011)
Case 2:13-cv-08513-SJO-JC   Document 1   Filed 11/18/13   Page 39 of 64   Page ID #:41

**End of Document**     © 2013 Thomson Reuters. No claim to original U.S. Government Works.

57 Fed.R.Serv.3d 491

351 F.3d 636
United States Court of Appeals,
Fifth Circuit.

Hector GARCIA, et al., Plaintiffs,
Hector Garcia, Inland Ocean
Inc., Plaintiffs-Appellants,
v.
KOCH OIL COMPANY OF TEXAS INC.; Koch
Gathering Systems Inc.; Koch Service Inc.; Koch
Oil Company, Koch Industries Inc.; Koch Pipelines
Inc.; Pipeline Company LP, Defendants-Appellees.

No. 02-21378.   |   Nov. 18, 2003.

Royalty and leasehold interest holders, on behalf of
themselves and others similarly situated, brought state court
suit against oil company and others, alleging that defendants
surreptitiously failed to reimburse them for certain oil and
gas overages, and seeking, inter alia, equitable accounting.
Action was removed. The United States District Court for
the Southern District of Texas, Kenneth M. Hoyt, J., denied
interest holders' motion to remand, but stayed action pending
interest holders' interlocutory appeal of determination the
amount in controversy requirement for diversity jurisdiction
over action was satisfied. On interlocutory appeal, the Court
of Appeals, King, Chief Judge, held that costs that defendants
would incur to perform equitable accounting could not be
considered in determining amount in controversy.

Reversed, with instructions.

West Headnotes (6)

**[1]   Removal of Cases**

   **Amount or Value Claimed or Involved**

Attorney fees of all plaintiffs in class
action could not be aggregated to named
class representatives in order to satisfy
amount in controversy requirement for diversity
jurisdiction over removed action. 28 U.S.C.A. §§
1332, 1441(b).

4 Cases that cite this headnote

**[2]   Removal of Cases**

   **Review**

Court of Appeals reviews district court's denial
of motion to remand removed case for lack of
subject-matter jurisdiction *de novo*.

1 Cases that cite this headnote

**[3]   Federal Courts**
   **Presumptions and Burden of Proof**
**Federal Courts**
   **Presumptions and Burden of Proof**

The party seeking to invoke federal diversity
jurisdiction bears burden of establishing both
that the parties are diverse and that amount in
controversy exceeds $75,000. 28 U.S.C.A. §
1332.

94 Cases that cite this headnote

**[4]   Removal of Cases**
   **Evidence**

When plaintiff's complaint does not allege a
specific amount of damages, the removing
defendant must prove by preponderance of
evidence that amount in controversy exceeds
diversity jurisdictional amount, and defendant
can satisfy its burden by first showing that it
is facially apparent from plaintiffs' complaint
that their claims are likely above jurisdictional
amount or if value of claim is not apparent, by
setting forth facts, either in removal petition or
by affidavit, that support finding of requisite
amount. 28 U.S.C.A. §§ 1332, 1441(b).

149 Cases that cite this headnote

**[5]   Removal of Cases**
   **Amount or Value Claimed or Involved**

Removing defendants may not aggregate
claims of different plaintiffs in putative
class action in order to satisfy the $75,000
amount in controversy requirement for diversity
jurisdiction. 28 U.S.C.A. §§ 1332, 1441(b).

10 Cases that cite this headnote

Garcia v. Koch Oil Co. of Texas Inc., 351 F.3d 636 (2003)
57 Fed.R.Serv.3d 491

[6]    **Removal of Cases**
       👉 Amount or Value Claimed or Involved

Costs that oil company and others would incur to perform equitable accounting, in connection with putative class action against them by royalty and leasehold interest holders, alleging that defendants surreptitiously failed to reimburse interest holders for certain oil and gas overages, could not be considered in calculating whether amount in controversy requirement for diversity jurisdiction over removed action was satisfied; costs were collateral to true object of litigation, i.e., reimbursing interest holders for overages, and costs were akin to discovery costs that were not part of amount in controversy. 28 U.S.C.A. §§ 1332, 1441(b).

13 Cases that cite this headnote

**Attorneys and Law Firms**

**\*637** Ralph Stephen Carrigan (argued) and Mark A. Carrigan, Law Office of Mark A. Carrigan, Houston, TX, for Plaintiffs-Appellants.

Charles F. Webber (argued), Faegre & Benson, Minneapolis, MN, for Defendants-Appellees.

Appeal from the United States District Court for the Southern District of Texas.

Before KING, Chief Judge, and DENNIS, Circuit Judge, and LYNN,[*] District Judge.

**Opinion**

KING, Chief Judge:

This case comes to us on an interlocutory appeal under 28 U.S.C. § 1292(b). At issue is the proper way to measure the amount in controversy, required for federal diversity jurisdiction under 28 U.S.C. § 1332, in the context of a suit seeking, *inter alia*, an equitable accounting. The district court held that the defendants' costs for performing the accounting may be considered in calculating the amount in controversy. We reverse.

**I. STATEMENT OF THE FACTS
AND PROCEDURAL HISTORY**

On September 3, 1999, Plaintiffs Hector H. Garcia and Inland Ocean, Inc.[1] filed a putative class action in the 49th Judicial District Court of Zapata County, Texas, on behalf of all Texas royalty and leasehold interest holders "from whom [the defendants] purchased oil and/or condensate between January 1, 1975 and December 31, 1989." Alleging that the defendants surreptitiously failed to reimburse them for certain oil and gas overages, the plaintiffs sought (1) an equitable accounting to determine whether any part of the overages could be attributed to individual plaintiffs' well sites, (2) restitution damages, and (3) attorney's fees and costs. The plaintiffs did not demand a specific amount of monetary damages, as the Texas Rules of Civil Procedure prohibit a plaintiff from doing so. *See* TEX.R. CIV. P. 47(b).

[1]    The defendants timely removed the case to the United States District Court for the Southern District of Texas under 28 U.S.C. § 1441(b) based on federal diversity jurisdiction, asserting that the amount in controversy exceeds $75,000 and that the parties are diverse.[2] *See* **\*638** 28 U.S.C. § 1332 (2000). The plaintiffs then filed a motion to remand claiming that the defendants had failed to proffer evidence that the requisite amount in controversy had been met. The district court denied the motion, however, when the defendants produced an affidavit stating that it would cost more than $75,000 per plaintiff to perform the requested accounting.

On agreement of the parties, the case was transferred to the Houston Division of the district court. The plaintiffs filed a second motion to remand on the basis that the costs of performing an equitable accounting should not be considered part of the "amount in controversy" under § 1332. On August 27, 2002, a magistrate judge recommended that the plaintiffs' motion be denied, because the defendants' affidavit "makes it clear that the costs of an accounting for even a single claimant in this matter would exceed the jurisdictional amount." The district court subsequently adopted the magistrate's findings in full and denied the motion to remand. At the plaintiffs' request, however, the district court stayed the case pending an interlocutory appeal to this court on the following controlling question of law: "In a class action seeking damages and an accounting, assuming diversity, [may] accounting costs to defendants in a range of $322,800 to $899,400 for examining the claim of a single plaintiff meet the amount in controversy

requirement of the diversity statute?" We hold that they may not.

## II. DISCUSSION

### A. Standard of Review

[2]   We review the district court's denial of a motion to remand for lack of subject-matter jurisdiction *de novo. Allen v. R & H Oil & Gas Co.,* 63 F.3d 1326, 1336 (5th Cir.1995); *see also Webb v. Investacorp, Inc.,* 89 F.3d 252, 255 (5th Cir.1996) (explaining that removal is an issue of statutory construction).

### B. Burden of Proof

[3]   In resolving this question, we recognize that "[t]he intent of Congress drastically to restrict federal jurisdiction in controversies between citizens of different states has always been rigorously enforced by the courts." *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288, 58 S.Ct. 586, 82 L.Ed. 845 (1938). Thus, in § 1332 Congress instructs that a suit between diverse parties may be adjudicated in a federal forum only if "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." The party seeking to invoke federal diversity jurisdiction bears the burden of establishing both that the parties are diverse and that the amount in controversy exceeds $75,000. *St. Paul Reinsurance Co. v. Greenberg,* 134 F.3d 1250, 1253 (5th Cir.1998). The question in this case is whether the second burden has been met. In *St. Paul Mercury Indemnity,* the Supreme Court delineated the general method for measuring the amount in controversy: "[U]nless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith." 303 U.S. at 288, 58 S.Ct. 586.

[4]   [5]   Here, the Texas Rules of Civil Procedure barred the plaintiffs from requesting a specific amount of damages in their state court petition. *See* TEX.R. CIV. P. 47(b). In a similar case, we held that "[w]hen the plaintiff's complaint does not allege a specific amount of damages, the removing defendant must prove by a preponderance **\*639** of the evidence that the amount in controversy exceeds" the jurisdictional amount. *De Aguilar v. Boeing Co.,* 11 F.3d 55, 58 (5th Cir.1993). This burden may be fulfilled in one of two ways. First, jurisdiction will be proper if "it is facially apparent" from the plaintiffs' complaint that their "claims are likely above [$75,000]." *Allen,* 63 F.3d at 1335. If the value of the claims is not apparent, then the defendants "may support

federal jurisdiction by setting forth the *facts-*[either] in the removal petition [or] by affidavit-that support a finding of the requisite amount." *Id.* Critically, the defendants may not aggregate the claims of different plaintiffs in order to satisfy the $75,000 jurisdictional amount in this putative class action. *See Snyder v. Harris,* 394 U.S. 332, 336-38, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969).

To date, no party has attempted to establish that the defendants owe more than $75,000 in restitution damages to any individual plaintiff in this case. In fact, the value of each plaintiff's property, which was allegedly converted by the defendants, will not be determined unless the plaintiffs achieve the equitable accounting relief they have requested. Nonetheless, the district court held that the defendants satisfied their burden of establishing that more than $75,000 is "in controversy" in this case. In a sworn affidavit, the defendants' accountant estimated that it will cost at least $300,000 per plaintiff to determine the amount of oil and gas condensate removed from each plaintiff's well sites during the years in question. The plaintiffs did not proffer any evidence disputing the cost of the equitable accounting, [3] and the court concluded that the requisite jurisdictional amount was satisfied.

### C. Analysis

[6]   Whether the district court's conclusion that the defendants have met their burden is correct, the plaintiffs argue, depends on the viewpoint by which the amount in controversy is measured. Plaintiffs claim that our precedent dictates that "the value of the plaintiff's right sought to be enforced must exceed the jurisdictional amount in order to confer federal jurisdiction." *Vraney v. County of Pinellas,* 250 F.2d 617, 618 (5th Cir.1958); *see also Alfonso v. Hillsborough County Aviation Auth.,* 308 F.2d 724, 727 (5th Cir.1962) (refusing to consider the potential loss to defendants because "[t]he value to the plaintiff of the right to be enforced or protected determines the amount in controversy"). The plaintiffs argue that the instant case should be remanded to state court because the accounting is of no "value" to them; rather it is merely a means to discover the amount of restitution damages they are owed. Therefore, they believe that the monetary damages, not the accounting costs, are the true amount in controversy. The plaintiffs conclude that because the defendants have not alleged that any one plaintiff will recover more than $75,000, the jurisdictional amount is unsatisfied.

57 Fed.R.Serv.3d 491

The defendants argue that it does not matter which viewpoint we follow. Alternatively, they urge us to follow an "either-party viewpoint" for determining the amount-in-controversy requirement. Emphasizing that the accounting relief requested by the plaintiffs is equitable in nature, the defendants argue that we should consider the costs of providing that relief as the amount in controversy. According to the defendants, because it will **\*640** cost them more than $75,000 to provide the equitable relief requested by each plaintiff, we must recognize these costs as a "pecuniary consequence" of the litigation that satisfies the jurisdictional amount. [4]

We conclude that the defendants are correct when they argue that it does not matter from which viewpoint the amount in controversy is viewed. Unlike the defendants, however, we believe that the costs of an equitable accounting should not be considered in determining the sum or value of the matter in controversy in the instant case. These costs are collateral to the true object of the litigation: reimbursement to the plaintiffs for the oil and gas condensate allegedly converted by the defendants.

The defendants urge us to remember that the first form of relief demanded by the plaintiffs is an "equitable accounting." If a court eventually determines that the plaintiffs have established a right to receive this relief, then the defendants believe that they will be forced to bear the costs of calculating how much oil and gas condensate was taken from each of the plaintiffs' wells between 1975 and 1989. Thus, the defendants argue, the litigation will necessarily resolve the controversy over whether the defendants are legally obliged to perform the accounting-essentially providing the plaintiffs the "value" of avoiding these expenses. Because they have proffered affidavit evidence demonstrating that these costs exceed § 1332's jurisdictional amount, the defendants argue that they have met their burden to establish that federal jurisdiction is proper.

We do not agree. According to the Supreme Court, in cases seeking equitable relief "it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 347, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Here, the true object of the litigation is the payment of restitution damages to the plaintiffs. The equitable accounting is merely the means by which the value of the these damages may be calculated.

**\*641** Our sister circuits have explained that an equitable accounting is simply a tool by which a plaintiff may shift the plaintiff's normal burden of discovery to the defendants. The Court of Appeals for the District of Columbia Circuit, for example, notes:

> An accounting is a species of compulsory disclosure, predicated upon the assumption that the party seeking relief does not have the means to determine how much- or, in fact, whether-any money properly his is being held by another. The appropriate remedy, particularly where the determinations may be detailed and complex, is an order to account in a proceeding in which the burden of establishing the non-existence of money due to the plaintiff rests upon the defendant. Because of the very nature of the remedy, that burden cannot rest upon plaintiff, but must shift to the defendant once facts giving rise to a duty to account have been alleged and admitted.

*Rosenak v. Poller,* 290 F.2d 748, 750 (D.C.Cir.1961); *see also Bradshaw v. Thompson,* 454 F.2d 75, 79 (6th Cir.1972) ("An accounting is a species of disclosure, predicated upon the legal inability of a plaintiff to determine how much, if any, money is due him from another."). Thus the costs of producing the requested accounting are akin to the discovery costs incurred by the parties in every lawsuit. We hold that these "litigation costs" are simply not relevant to whether diversity jurisdiction exists under § 1332. See *Ratliff v. Sears, Roebuck & Co.,* 911 F.Supp. 177, 179-80 (E.D.N.C.1995) (holding that a defendant's discovery costs are not part of the amount in controversy).

Our decision comports with the manner by which we measure the jurisdictional amount in actions where a trustee is compelled to perform an accounting of the assets in a trust or when an administrator is ordered to account for the value of the property in an estate. In *Davidson v. Blaustein,* the court reviewed the law in this area and found that "[w]here affirmative relief is sought by an accounting, the amount in controversy is measured by the value of the res, the damage to the res sought to be redressed, or the monetary value of the complainant's share of the res which is distributable." 247 F.Supp. 225, 228 (D.Md.1965) (citations omitted). This last

metric is analogous to the jurisdictional amount in the case at hand. Without question, the true "amount in controversy" is the restitution award that the defendants may be required to pay to the putative class members as a consequence of removing more oil and gas condensate from the plaintiffs' various well sites than the defendants previously reported. Therefore, because neither party contends that the defendants owe more than $75,000 to any single plaintiff, the defendants have failed to demonstrate the existence of federal diversity jurisdiction.

## III. CONCLUSION

For the foregoing reasons, we find that the defendants have not met their burden of proving that this case satisfies the amount-in-controversy requirement of § 1332. Therefore, we REVERSE and instruct the district court to REMAND this case to state court. Costs shall be borne by the defendants.

**Parallel Citations**

57 Fed.R.Serv.3d 491

Footnotes

*    District Judge for the Northern District of Texas, sitting by designation.

1    A third plaintiff, the Estate of Alice Barnes, was voluntarily dismissed from the case without prejudice on January 2, 2002, and will not be discussed in this opinion.

2    In their notice of removal, the defendants also claimed that Koch Oil Company of Texas, Inc. had been fraudulently joined by the plaintiffs. The district court agreed, and this issue has not been preserved on appeal. In addition, the defendants asked the district court to attribute all of the plaintiffs' attorney's fees to the named class representatives in order to calculate the amount in controversy. The defendants have since conceded, however, that class action attorney's fees cannot be aggregated in this manner. See *Coghlan v. Wellcraft Marine Corp.,* 240 F.3d 449, 455 n. 5 (5th Cir.2001) (noting that, for jurisdictional purposes, "[t]he standard approach to awards of attorney's fees in a class action context is to distribute them pro rata to all class members, both named and unnamed").

3    In both their second motion to remand and their briefs on appeal, plaintiffs argue that it will not cost $75,000 to perform the equitable accounting. They have provided no record evidence to support this claim, however.

4    The defendants' argument is based on their assumption that we implicitly approved of the either-party viewpoint in *Duderwicz v. Sweetwater Savings Association,* 595 F.2d 1008 (5th Cir.1979), when we followed the reasoning of a line of cases "support[ing] the proposition that the value of the matter in controversy is measured not by the monetary judgment which the plaintiff may recover, but by the judgment's pecuniary consequence to those involved in the litigation." *Id.* at 1014. Contrary to the defendants' view, *Duderwicz* did not signal our acceptance of the "either-party viewpoint"; rather, it presented the question whether, in calculating the amount in controversy for a case involving a usurious contract, we should consider only the "interest already paid" on the contract or whether we should instead consider the total "interest contracted to be charged" over the lifetime of the contract. *Id.* at 1012, 1014. Critically, we noted that the answer to this question depended on "[s]tate law," which "defines the nature of the right *plaintiff* seeks to enforce." *Id.* at 1012 (emphasis added). The Court of Appeals for the Eleventh Circuit, which is also bound by *Duderwicz,* reads this case as we do and similarly concludes that it does not signal an "abandonment of the plaintiff-viewpoint rule" by the Fifth Circuit. *Ericsson GE Mobile Communications, Inc. v. Motorola Communications & Elecs., Inc.,* 120 F.3d 216, 220 & n. 13 (11th Cir.1997).
     We also disagree with the defendants' assertion that our decision in *Webb* indicates that this circuit no longer focuses solely on the plaintiff's viewpoint to determine the amount in controversy in cases seeking equitable relief. See *Webb,* 89 F.3d at 257 n. 1 (stating specifically that the court's holding "does not violate the rule ... that '[t]he value to the *plaintiff* of the right to be enforced or protected determines the amount in controversy' " (quoting *Alfonso,* 308 F.2d at 727) (alteration in original)).

End of Document                                            © 2013 Thomson Reuters. No claim to original U.S. Government Works.

119 S.Ct. 1322, 143 L.Ed.2d 448, 43 Fed.R.Serv.3d 1, 99 Cal. Daily Op. Serv. 2474...

119 S.Ct. 1322
Supreme Court of the United States

MURPHY BROTHERS, INC., Petitioner,

v.

MICHETTI PIPE STRINGING, INC.

No. 97–1909.    |    Argued March
1, 1999.    |    Decided April 5, 1999.

In state court breach of contract and fraud action, defendant
filed notice of removal, and plaintiff filed motion to remand.
The United States District Court for the Northern District of
Alabama, J. Foy Guin, Jr., J., denied motion, but certified
order for interlocutory appeal. The United States Court of
Appeals for the Eleventh Circuit reversed and remanded,
125 F.3d 1396. Certiorari was granted. The Supreme Court,
Justice Ginsburg, abrogating Reece, 98 F.3d 839, and Roe,
38 F.3d 298, held that 30–day removal period began to run
not when defendant received faxed, file-stamped copy of
complaint, but rather, when defendant was later formally
served by certified mail.

Court of Appeals' judgment reversed and remanded.

Chief Justice Rehnquist issued dissenting opinion in which
Justices Scalia and Thomas joined.

West Headnotes (9)

**[1]**    **Process**
👉 Nature and necessity in general
Service of process is fundamental to any
procedural imposition on a named defendant.

65 Cases that cite this headnote

**[2]**    **Process**
👉 Nature and necessity in general
In the absence of service of process (or waiver of
service by the defendant), a court ordinarily may
not exercise power over a party the complaint
names as defendant.

241 Cases that cite this headnote

**[3]**    **Process**
👉 Requirement as to appearance and pleading
**Process**
👉 Nature and necessity in general
One becomes a party officially, and is required
to take action in that capacity, only upon service
of a summons or other authority-asserting
measure stating the time within which the
party served must appear and defend. Fed.Rules
Civ.Proc.Rule 4(a), 28 U.S.C.A.

68 Cases that cite this headnote

**[4]**    **Process**
👉 Nature and necessity in general
Unless a named defendant agrees to waive
service, the summons continues to function as
the sine qua non directing an individual or entity
to participate in a civil action or forgo procedural
or substantive rights. Fed.Rules Civ.Proc.Rule
4(a), 28 U.S.C.A.

89 Cases that cite this headnote

**[5]**    **Removal of Cases**
👉 Removal at or Before Time to Answer or
Plead
Thirty-day removal period began to run not when
defendant received faxed, file-stamped copy of
complaint, but rather, when defendant was later
formally served by certified mail; abrogating
Reece v. Wal–Mart Stores, Inc., 98 F.3d 839, and
Roe v. O'Donohue, 38 F.3d 298. 28 U.S.C.A. §
1446(b).

359 Cases that cite this headnote

**[6]**    **Removal of Cases**
👉 Removal at or Before Time to Answer or
Plead
If the summons and complaint are served
together, the 30–day period for removal runs at
once. 28 U.S.C.A. § 1446(b).

17 Cases that cite this headnote

**[7]**    **Removal of Cases**

Case 2:13-cv-08513-SJO-JC   Document 1   Filed 11/18/13   Page 46 of 64   Page ID #:48
Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344 (1999)

119 S.Ct. 1322, 143 L.Ed.2d 448, 43 Fed.R.Serv.3d 1, 99 Cal. Daily Op. Serv. 2474...

👉 Removal at or Before Time to Answer or Plead

If the defendant is served with the summons but the complaint is furnished to the defendant sometime after, the 30–day period for removal runs from the defendant's receipt of the complaint. 28 U.S.C.A. § 1446(b).

189 Cases that cite this headnote

**[8]    Removal of Cases**

👉 Removal at or Before Time to Answer or Plead

If the defendant is served with the summons and the complaint is filed in court, but under local rules, service of the complaint is not required, the 30–day period for removal runs from the date the complaint is made available through filing. 28 U.S.C.A. § 1446(b).

369 Cases that cite this headnote

**[9]    Removal of Cases**

👉 Removal at or Before Time to Answer or Plead

If the complaint is filed in court prior to any service, the 30–day period for removal runs from the service of the summons. 28 U.S.C.A. § 1446(b).

140 Cases that cite this headnote

**\*\*1323  *Syllabus* \***

On January 26, 1996, respondent Michetti Pipe Stringing, Inc. (Michetti), filed a complaint in Alabama state court seeking damages for an alleged breach of contract and fraud by petitioner Murphy Bros., Inc. (Murphy). Michetti did not serve Murphy then, but three days later it faxed a "courtesy copy" of the file-stamped complaint to a Murphy vice president. Michetti officially served Murphy under local law by certified mail on February 12, 1996. On March 13, 1996 (30 days after service but 44 days after receiving the faxed copy of the complaint), Murphy removed the case under 28 U.S.C. § 1441 to the Federal District Court. Michetti moved to remand the case to the state court on the ground that Murphy

filed the removal notice 14 days too late under § 1446(b), which specifies, in relevant part, that the notice "shall be filed within thirty days after the receipt by the defendant, *through service or otherwise,* of a copy of the [complaint]." (Emphasis added.) Because the notice had not been filed within 30 days of the date on which Murphy's vice president received the facsimile transmission, Michetti asserted, the removal was untimely. The District Court denied the remand motion on the ground that the 30–day removal period **\*\*1324** did not commence until Murphy was officially served with a summons. On interlocutory appeal, the Eleventh Circuit reversed and remanded, instructing the District Court to remand the action to state court. Emphasizing the statutory words "receipt ... or otherwise," the Eleventh Circuit held that the defendant's receipt of a faxed copy of the filed initial pleading sufficed to commence the 30–day removal period.

*Held:* A named defendant's time to remove is triggered by simultaneous service of the summons and complaint, or receipt of the complaint, "through service or otherwise," after and apart from service of the summons, but not by mere receipt of the complaint unattended by any formal service. Pp. 1326–1330.

(a) Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant. In the absence of such service (or waiver of service by the defendant), a court ordinarily may not exercise power over a party the **\*345** complaint names as defendant. See *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97, 104, 108 S.Ct. 404, 98 L.Ed.2d 415. Accordingly, one becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend. See Fed. Rules Civ. Proc. 4(a) and 12(a)(1)(A). Unless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights. Pp. 1326–1327.

(b) In enacting § 1446(b), Congress did not endeavor to break away from the traditional understanding. Prior to 1948, a defendant could remove a case any time before the expiration of the time to respond to the complaint under state law. Because that time limit varied from State to State, however, the removal period correspondingly varied. To reduce the disparity, Congress in 1948 enacted the original version of § 1446(b), which required that the removal petition in a civil

Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344 (1999)

119 S.Ct. 1322, 143 L.Ed.2d 448, 43 Fed.R.Serv.3d 1, 99 Cal. Daily Op. Serv. 2474...

action be filed within 20 days after commencement of the action or service of process, whichever was later. However, as first framed, § 1446(b) did not give adequate time or operate uniformly in States such as New York, where service of the summons commenced the action and could precede the filing of the complaint, so that the removal period could have expired *before* the defendant obtained access to the complaint. To ensure such access before commencement of the removal period, Congress in 1949 enacted the current version of § 1446(b). Nothing in the 1949 amendment's legislative history so much as hints that Congress, in making changes to accommodate atypical state commencement and complaint filing procedures, intended to dispense with the historic function of service of process as the official trigger for responsive action by a named defendant. Pp. 1327–1328.

(c) Relying on the "plain meaning" of § 1446(b) that the panel perceived, the Eleventh Circuit was of the view that "[receipt] through service or otherwise" opens a universe of means besides service for putting the defendant in possession of the complaint. However, the Eleventh Circuit did not delineate the dimensions of that universe. Nor can one tenably maintain that the words "or otherwise" provide a clue. Cf., *e.g., Potter v. McCauley,* 186 F.Supp. 146, 149. The interpretation of § 1446(b) adopted here adheres to tradition, makes sense of the phrase "or otherwise," and assures defendants adequate time to decide whether to remove an action to federal court. The various state provisions for service of the summons and the filing or service of the complaint fit into one or another of four main categories. See *ibid.* In each of those categories, the defendant's removal period will be no less than 30 days **\*346** from service, and in some of the categories, it will be more than 30 days from service, depending on when the complaint is received. First, if the summons and complaint are served together, the 30–day removal period runs at once. Second, if the defendant is served with the summons but is furnished with the complaint sometime after, the removal period runs from the receipt of the complaint. Third, if the defendant is served with the summons and the complaint **\*\*1325** is filed in court, but under local rules, service of the complaint is not required, the removal period runs from the date the complaint is made available through filing. Finally, if the complaint is filed in court prior to any service, the removal period runs from the service of the summons. See *ibid.* Notably, Rule 81(c), amended in 1949, uses the identical "receipt through service or otherwise" language in specifying the 20–day period in which the defendant must answer the complaint once the case has been removed. Rule 81(c) has been interpreted to afford the defendant at least

20 days after service of process to respond. See *Silva v. Madison,* 69 F.3d 1368, 1376–1377. In *Silva,* the Seventh Circuit distinguished its earlier decision in *Roe v. O'Donohue,* 38 F.3d 298 (defendant need not receive service before time for removal under § 1446(b) begins to run), but did not adequately explain why one who has not yet lawfully been made a party to an action should be required to decide in which court system the case should be heard. If, as the *Silva* court rightly determined, the "service or otherwise" language was not intended to abrogate the service requirement for purposes of Rule 81(c), that same language also was not intended to bypass service as a starter for § 1446(b)'s clock. The fact that the Seventh Circuit could read the phrase "or otherwise" differently in *Silva* and *Roe,* moreover, undercuts the Eleventh Circuit's position that the phrase has an inevitably "plain meaning." Furthermore, the so-called "receipt rule"—starting the time to remove on receipt of a copy of the complaint, however informally, despite the absence of any formal service—could operate with notable unfairness to defendants in foreign nations. Because facsimile machines transmit instantaneously, but formal service abroad may take much longer than 30 days, plaintiffs would be able to dodge international treaty requirements and trap foreign opponents into keeping their suits in state courts. Pp. 1328–1329.

(d) In sum, it would take a clearer statement than Congress has made to read its endeavor to extend removal time (by adding receipt of the complaint) to effect so strange a change —to set removal apart from all other responsive acts, to render removal the sole instance in which one's procedural rights slip away before service of a summons, *i.e.,* before one is subject to any court's authority. Pp. 1329–1330.

125 F.3d 1396, reversed and remanded.

**\*347** GINSBURG, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, KENNEDY, SOUTER, and BREYER, JJ., joined. REHNQUIST, C.J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ., joined, *post,* p. 1330.

**Attorneys and Law Firms**

Deborah A. Smith for petitioner.

J. David Pugh for respondent.

Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344 (1999)

119 S.Ct. 1322, 143 L.Ed.2d 448, 43 Fed.R.Serv.3d 1, 99 Cal. Daily Op. Serv. 2474...

## Opinion

Justice GINSBURG delivered the opinion of the Court.

This case concerns the time within which a defendant named in a state-court action may remove the action to a federal court. The governing provision is 28 U.S.C. § 1446(b), which specifies, in relevant part, that the removal notice "shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the [complaint]." The question presented is whether the named defendant must be officially summoned to appear in the action before the time to remove begins to run. Or, may the 30–day period start earlier, on the named defendant's receipt, before service of official process, of a "courtesy copy" of the filed complaint faxed by counsel for the plaintiff?

We read Congress' provisions for removal in light of a bedrock principle: An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process. Accordingly, we hold that a named defendant's time to **\*348** remove is triggered by simultaneous service of the summons and complaint, or receipt of the complaint, "through service or otherwise," after and apart from service of the summons, but not by mere receipt of the complaint unattended by any formal service.

## I

On January 26, 1996, respondent Michetti Pipe Stringing, Inc. (Michetti), filed a complaint in Alabama state court seeking damages for an alleged breach of contract and fraud by petitioner Murphy Bros., Inc. (Murphy). **\*\*1326** Michetti did not serve Murphy at that time, but three days later it faxed a "courtesy copy" of the file-stamped complaint to one of Murphy's vice presidents. The parties then engaged in settlement discussions until February 12, 1996, when Michetti officially served Murphy under local law by certified mail.

On March 13, 1996 (30 days after service but 44 days after receiving the faxed copy of the complaint), Murphy removed the case under 28 U.S.C. § 1441 to the United States District Court for the Northern District of Alabama.[1] Michetti moved to remand the case to the state court on the ground that Murphy filed the removal notice 14 days too late. The notice of removal had not been filed within 30 days of the date

on which Murphy's vice president received the facsimile transmission. Consequently, Michetti asserted, the removal was untimely under 28 U.S.C. § 1446(b), which provides:

"The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, *through service or otherwise,* of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within thirty days after the service of summons upon the defendant **\*349** if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter." (Emphasis added.)

The District Court denied the remand motion on the ground that the 30–day removal period did not commence until Murphy was officially served with a summons. The court observed that the phrase "or otherwise" was added to § 1446(b) in 1949 to govern removal in States where an action is commenced merely by the service of a summons, without any requirement that the complaint be served or even filed contemporaneously. See App. A–24. Accordingly, the District Court said, the phrase had "no field of operation" in States such as Alabama, where the complaint must be served along with the summons. See *ibid.*

On interlocutory appeal permitted pursuant to 28 U.S.C. § 1292(b), the Court of Appeals for the Eleventh Circuit reversed and remanded, instructing the District Court to remand the case to state court. 125 F.3d 1396, 1399 (1997). The Eleventh Circuit held that "the clock starts to tick upon the defendant's receipt of a copy of the filed initial pleading." *Id.,* at 1397. "By and large," the appellate court wrote, "our analysis begins and ends with" the words "receipt ... or otherwise." *Id.,* at 1397–1398 (emphasis deleted). Because lower courts have divided on the question whether service of process is a prerequisite for the running of the 30–day removal period under § 1446(b),[2] we granted certiorari. 525 U.S. 960, 119 S.Ct. 401, 142 L.Ed.2d 326 (1998).

## \*350 II

[1]   Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant. At common law, the writ of *capias ad respondendum* directed the sheriff to secure the defendant's appearance by taking him into custody. See 1 J. Moore, Moore's Federal Practice ¶ 0.6[2.–2], p. 212 (2d ed. 1996)

("[T]he three royal courts, Exchequer, Common Pleas, and King's Bench ... obtained an *in personam* jurisdiction over the defendant in the same manner through the writ of *capias ad respondendum*."). The requirement that a defendant be brought into litigation by official **\*\*1327** service is the contemporary counterpart to that writ. See *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ("[T]he *capias ad respondendum* has given way to personal service of summons or other form of notice.").

[2] [3] [4] In the absence of service of process (or waiver of service by the defendant), a court ordinarily may not exercise power over a party the complaint names as defendant. See *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97, 104, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987) ("Before a ... court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."); *Mississippi Publishing Corp. v. Murphree,* 326 U.S. 438, 444–445, 66 S.Ct. 242, 90 L.Ed. 185 (1946) ("[S]ervice of summons is the procedure by which a court ... asserts jurisdiction over the person of the party served."). Accordingly, one becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend. See Fed. Rule Civ. Proc. 4(a) ("[The summons] shall ... state the time within which the defendant must appear and defend, and notify the defendant that failure to do so will result in a judgment by default against the defendant."); Rule 12(a)(1)(A) (a defendant shall serve an answer within 20 days of being **\*351** served with the summons and complaint). Unless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights.

### III

When Congress enacted § 1446(b), the legislators did not endeavor to break away from the traditional understanding. Prior to 1948, a defendant could remove a case any time before the expiration of her time to respond to the complaint under state law. See, *e.g.,* 28 U.S.C. § 72 (1940 ed.). Because the time limits for responding to the complaint varied from State to State, however, the period for removal correspondingly varied. To reduce the disparity, Congress in 1948 enacted the original version of § 1446(b), which provided that "[t]he petition for removal of a civil action

or proceeding may be filed within twenty days after commencement of the action or service of process, whichever is later." Act of June 25, 1948, 62 Stat. 939, as amended, 28 U.S.C. § 1446(b). According to the relevant House Report, this provision was intended to "give adequate time and operate uniformly throughout the Federal jurisdiction." H.R.Rep. No. 308, 80th Cong., 1st Sess., A135 (1947).

Congress soon recognized, however, that § 1446(b), as first framed, did not "give adequate time and operate uniformly" in all States. In States such as New York, most notably, service of the summons commenced the action, and such service could precede the filing of the complaint. Under § 1446(b) as originally enacted, the period for removal in such a State could have expired *before* the defendant obtained access to the complaint.

To ensure that the defendant would have access to the complaint before commencement of the removal period, Congress in 1949 enacted the current version of § 1446(b): "The petition for removal of a civil action or proceeding shall be **\*352** filed within twenty days [now thirty days] [3] after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based." Act of May 24, 1949, § 83(a), 63 Stat. 101. The accompanying Senate Report explained:

"In some States suits are begun by the service of a summons or other process without the necessity of filing any pleading until later. As the section now stands, this places the defendant in the position of having to take steps to remove a suit to Federal court before he knows what the suit is about. As said section is herein proposed to be rewritten, a defendant is **\*\*1328** not required to file his petition for removal until 20 days after he has received (or it has been made available to him) a copy of the initial pleading filed by the plaintiff setting forth the claim upon which the suit is based and the relief prayed for. It is believed that this will meet the varying conditions of practice in all the States." S.Rep. No. 303, 81st Cong., 1st Sess., 6 (1949).

See also H.R.Rep. No. 352, 81st Cong., 1st Sess., 14 (1949) ("The first paragraph of the amendment to subsection (b) corrects [the New York problem] by providing that the petition for removal need not be filed until 20 days after the defendant has received a copy of the plaintiff's initial pleading."). [4] Nothing in the legislative history of the 1949 **\*353** amendment so much as hints that

Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344 (1999)

119 S.Ct. 1322, 143 L.Ed.2d 448, 43 Fed.R.Serv.3d 1, 99 Cal. Daily Op. Serv. 2474...

Congress, in making changes to accommodate atypical state commencement and complaint filing procedures, intended to dispense with the historic function of service of process as the official trigger for responsive action by an individual or entity named defendant. [5]

## IV

**[5]**    The Eleventh Circuit relied on the "plain meaning" of § 1446(b) that the panel perceived. See 125 F.3d, at 1398. In the Eleventh Circuit's view, because the term " '[r]eceipt' is the nominal form of 'receive,' which means broadly 'to come into possession of' or to 'acquire,' " the phrase " '[receipt] through service or otherwise' opens a universe of means besides service for putting the defendant in possession of the complaint." *Ibid.* What are the dimensions of that "universe"? The Eleventh Circuit's opinion is uninformative. Nor can one tenably maintain that the words "or otherwise" provide a clue. Cf. *Potter v. McCauley,* 186 F.Supp. 146, 149 (D.Md.1960) ("It is not possible to state definitely in general terms the precise scope and effect of the word 'otherwise' in its context here because its proper application in particular situations will vary with state procedural requirements."); *Apache Nitrogen Products, Inc. v.* **\*354** *Harbor Ins. Co.,* 145 F.R.D. 674, 679 (D.Ariz.1993) ("[I]f in fact the words 'service or otherwise' had a plain meaning, the cases would not be so hopelessly split over their proper interpretation.").

The interpretation of § 1446(b) adopted here adheres to tradition, makes sense of the phrase "or otherwise," and assures defendants adequate time to decide whether to remove an action to federal court. As the court in *Potter* observed, the various state provisions for service of the summons and the filing or service of the complaint fit into one or another of four main categories. See 186 F.Supp., at 149. In each of the four categories, the defendant's period for removal will be no less than 30 days from service, and in some categories, it will be more than 30 days from service, depending on when the complaint is received.

**[6]    [7]    [8]    [9]**    As summarized in *Potter,* the possibilities are as follows. First, if the summons and complaint are served together, the 30–day period for removal runs at once. Second, if the defendant is served with the summons " **\*\*1329** but the complaint is furnished to the defendant sometime after, the period for removal runs from the defendant's receipt of the complaint. Third, if the defendant is served with the summons and the complaint is filed in court, but under local rules, service of the complaint is not required, the removal

period runs from the date the complaint is made available through filing. Finally, if the complaint is filed in court prior to any service, the removal period runs from the service of the summons. See *ibid.*

Notably, Federal Rule of Civil Procedure 81(c), amended in 1949, uses the identical "receipt through service or otherwise" language in specifying the time the defendant has to answer the complaint once the case has been removed:

> "In a removed action in which the defendant has not answered, the defendant shall answer or present the other defenses or objections available under these rules **\*355** within 20 days after the receipt through service or otherwise of a copy of the initial pleading setting forth the claim for relief upon which the action or proceeding is based."

Rule 81(c) sensibly has been interpreted to afford the defendant at least 20 days after service of process to respond. See *Silva v. Madison,* 69 F.3d 1368, 1376–1377 (C.A.7 1995). In *Silva,* the Seventh Circuit Court of Appeals observed that "nothing ... would justify our concluding that the drafters, in their quest for evenhandedness and promptness in the removal process, intended to abrogate the necessity for something as fundamental as service of process." *Id., at 1376.* In reaching this conclusion, the court distinguished an earlier decision, *Roe v. O'Donohue,* 38 F.3d 298 (C.A.7 1994), which held that a defendant need not receive service of process before his time for removal under § 1446(b) begins to run. See 69 F.3d, at 1376. But, as the United States maintains in its *amicus curiae* brief, the *Silva* court "did not adequately explain why one who has not yet lawfully been made a party to an action should be required to decide in which court system the case should be heard." Brief for United States as *Amicus Curiae* 13, n. 4. If, as the Seventh Circuit rightly determined, the "service or otherwise" language was not intended to abrogate the service requirement for purposes of Rule 81(c), that same language also was not intended to bypass service as a starter for § 1446(b)'s clock. The fact that the Seventh Circuit could read the phrase "or otherwise" differently in *Silva* and *Roe,* moreover, undercuts the Eleventh Circuit's position that the phrase has an inevitably "plain meaning." [6]

**\*356**    Furthermore, the so-called "receipt rule"—starting the time to remove on receipt of a copy of the complaint, however informally, despite the absence of any formal

service—could, as the District Court recognized, operate with notable unfairness to individuals and entities in foreign nations. See App. A–24. Because facsimile machines transmit instantaneously, but formal service abroad may take much longer than 30 days,[7] plaintiffs "would be able to dodge the requirements of international treaties and trap foreign opponents into keeping their suits in state courts." *Ibid.*

\* \* \*

In sum, it would take a clearer statement than Congress has made to read its endeavor to extend removal time (by adding receipt of the complaint) to effect so strange a change—to set removal apart from all other responsive acts, to render removal the sole **\*\*1330** instance in which one's procedural rights slip away before service of a summons, *i.e.,* before one is subject to any court's authority. Accordingly, for the reasons stated in this opinion, the judgment of the United States Court of Appeals for the Eleventh Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**\*357** Chief Justice REHNQUIST, with whom Justice SCALIA and Justice THOMAS join, dissenting.
Respondent faxed petitioner a copy of the file-stamped complaint in its commenced state-court action, and I believe that the receipt of this facsimile triggered the 30–day removal period under the plain language of 28 U.S.C. § 1446(b). The Court does little to explain why the plain language of the statute should not control, opting instead to superimpose a judicially created service of process requirement onto § 1446(b). In so doing, it departs from this Court's practice of strictly construing removal and similar jurisdictional statutes. See *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 108–109, 61 S.Ct. 868, 85 L.Ed. 1214 (1941). Because I believe the Eleventh Circuit's analysis of the issue presented in this case was cogent and correct, see 125 F.3d 1396, 1397–1398 (1997), I would affirm the dismissal of petitioner's removal petition for the reasons stated by that court.

**Parallel Citations**

119 S.Ct. 1322, 143 L.Ed.2d 448, 43 Fed.R.Serv.3d 1, 99 Cal. Daily Op. Serv. 2474, 1999 Daily Journal D.A.R. 3237, 1999 CJ C.A.R. 1917, 12 Fla. L. Weekly Fed. S 183

Footnotes

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1     Murphy invoked the jurisdiction of the Federal District Court under 28 U.S.C. § 1332 based on diversity of citizenship. Michetti is a Canadian company with its principal place of business in Alberta, Canada; Murphy is an Illinois corporation with its principal place of business in that State.

2     Compare *Reece v. Wal–Mart Stores, Inc.,* 98 F.3d 839, 841 (C.A.5 1996) (removal period begins with receipt of a copy of the initial pleading through any means, not just service of process); *Roe v. O'Donohue,* 38 F.3d 298, 303 (C.A.7 1994) ("Once the defendant possesses a copy of the complaint, it must decide promptly in which court it wants to proceed."), with *Bowman v. Weeks Marine, Inc.,* 936 F.Supp. 329, 333 (D.S.C.1996) (removal period begins only upon proper service of process); *Baratt v. Phoenix Mut. Life Ins. Co.,* 787 F.Supp. 333, 336 (W.D.N.Y.1992) (proper service is a prerequisite to commencement of removal period).

3     Congress extended the period for removal from 20 days to 30 days in 1965. See Act of Sept. 29, 1965, 79 Stat. 887.

4     The second half of the revised § 1446(b), providing that the petition for removal shall be filed "within twenty days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter," § 83(b), 63 Stat. 101, was added to address the situation in States such as Kentucky, which required the complaint to be filed at the time the summons issued, but did not require service of the complaint along with the summons. See H.R.Rep. No. 352, 81st Cong., 1st Sess., 14 (1949) ("Th[e first clause of revised § 1446(b) ], however, without more, would create further difficulty in those States, such as Kentucky, where suit is commenced by the filing of the plaintiff's initial pleading and the issuance and service of a summons without any requirement that a copy of the pleading be served upon or otherwise furnished to the defendant. Accordingly ... the amendment provides that in such cases the petition for removal shall be filed within 20 days after the service of the summons.").

5     It is evident, too, that Congress could not have foreseen the situation posed by this case, for, as the District Court recognized, "[i]n 1949 Congress did not anticipate use of facsimile *[sic]* transmissions." App. A–23, n. 1. Indeed, even the photocopy machine was

Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344 (1999)
119 S.Ct. 1322, 143 L.Ed.2d 448, 43 Fed.R.Serv.3d 1, 99 Cal. Daily Op. Serv. 2474...

       not yet on the scene at that time. See 9 New Encyclopedia Britannica 400 (15th ed.1985) (noting that photocopiers "did not become available for commercial use until 1950").

6      Contrary to a suggestion made at oral argument, see Tr. of Oral Arg. 6–7, 28 U.S.C. § 1448 does not support the Eleventh Circuit's position. That section provides that "[i]n all cases removed from any State court to any district court of the United States in which any one or more of the defendants has not been served with process or in which the service has not been perfected prior to removal ... such process or service may be completed or new process issued in the same manner as in cases originally filed in such district court." Nothing in § 1448 requires the defendant to take any action. The statute simply allows the plaintiff to serve an unserved defendant or to perfect flawed service once the action has been removed. In fact, the second paragraph of § 1448, which provides that "[t]his section shall not deprive any defendant upon whom process is served after removal of his right to move to remand the case," explicitly reserves the unserved defendant's right to take action (move to remand) *after* service is perfected.

7      See, *e.g.,* Fed. Rule Civ. Proc. 4(f) (describing means of service upon individuals in a foreign country).

---

**End of Document**                                 © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:13-cv-09513-SJO-JC   Document 1   Filed 11/18/13   Page 53 of 64   Page ID #:55
Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333 (1977)
97 S.Ct. 2434, 53 L.Ed.2d 383

97 S.Ct. 2434
Supreme Court of the United States

James B. HUNT, Jr., Governor of the
State of North Carolina, et al., Appellants,

v.

WASHINGTON STATE APPLE
ADVERTISING COMMISSION.

No. 76-63.   |   Argued Feb. 22,
1977.   |   Decided June 20, 1977.

The Washington State Apple Advertising Commission brought action seeking declaratory and injunctive relief and challenging the constitutionality of North Carolina statute which in effect prohibits the display of Washington State apple grades on closed containers shipped into the state. A Three-Judge District Court, granted the requested relief, 408 F.Supp. 857, and defendants appealed. The Supreme Court, Mr. Chief Justice Burger, held that: (1) the Commission's status as a state agency, rather than a traditional voluntary membership organization, did not preclude it from asserting, in a representational capacity, claims of Washington apple growers and dealers who formed its constituency, notwithstanding that "membership" was "compelled" in the form of mandatory assessments; (2) record, including sales volume and compliance costs among other matters, precluded conclusion "to a legal certainty" that such losses and expenses would not, if they had not done so already, amount to the requisite $10,000 for at least some of individual growers and dealers and thus jurisdictional requirement of $10,000 in controversy was met, and (3) challenged statute violates commerce clause insofar as it prohibits the display of Washington State grades even if enacted for the declared purpose of protecting consumers from deception and fraud in the market place.

Affirmed.

West Headnotes (13)

[1]   **Associations**
      👉 Actions by or Against Associations

      An association may have standing to assert the claims of its members even where it has suffered no injury from the challenged activity.

512 Cases that cite this headnote

[2]   **Associations**
      👉 Actions by or Against Associations

      An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to their organization's purpose and neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit.

1824 Cases that cite this headnote

[3]   **Federal Courts**
      👉 Particular cases or questions, justiciable controversy

      Where North Carolina statute had caused some Washington apple growers and dealers to obliterate Washington State grades from large volume of closed containers destined for North Carolina market at cost ranging from five to 15 cents per carton, had abandoned the use of preprinted containers thus diminishing efficiency of their marketing operations and had lost accounts in North Carolina, such injuries were direct and sufficient to establish the requisite "case or controversy" between Washington apple producers and North Carolina officials.

37 Cases that cite this headnote

[4]   **Associations**
      👉 Actions by or Against Associations

      Neither interstate commerce claim nor request for declaratory and injunctive relief required individualized proofs and thus were properly resolved in a group context on issue of "associational standing" to sue.

999 Cases that cite this headnote

[5]   **Constitutional Law**
      👉 Particular Questions or Grounds of Attack in General

Case 2:13-cv-08513-SJO-JC Document 1 Filed 11/18/13 Page 54 of 64 Page ID #:56
Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333 (1977)
97 S.Ct. 2434, 53 L.Ed.2d 383

In action brought by Washington State Apple Advertising Commission challenging constitutionality of North Carolina statute which in effect prohibited the display of Washington State apple grade on closed containers shipped into state, the Commission's status as a state agency, rather than a traditional voluntary membership organization, did not preclude it from asserting, in a representational capacity, claims of Washington apple growers and dealers who formed its constituency, notwithstanding that "membership" was "compelled" in the form of mandatory assessments.

76 Cases that cite this headnote

**[6] Federal Courts**
🗝 Particular claims or demands

Determination that Washington State Apple Advertising Commission had standing to assert rights of individual growers and dealers in a representational capacity necessarily permitted Commission to rely on claims of its constituents to meet requisite amount in controversy for jurisdictional purposes. 28 U.S.C.A. § 1331.

120 Cases that cite this headnote

**[7] Federal Courts**
🗝 Injunction proceedings

In action seeking declaratory or injunctive relief, the amount in controversy for jurisdictional purposes is measured by the value of the object of the litigation. 28 U.S.C.A. § 1331.

685 Cases that cite this headnote

**[8] Federal Courts**
🗝 Weight and sufficiency

In action brought by Washington State Apple Advertising Commission for declaratory and injunctive relief on claim of invalidity of North Carolina statute which in effect prohibited the display of Washington State apple grade on closed containers shipped into state, record, including sales volume and compliance costs among other matters, precluded conclusion "to a legal certainty" that such losses and expenses

would not, if they had not done so already, amount to the requisite $10,000 for at least some of individual growers and dealers and thus jurisdictional requirement of $10,000 in controversy was met. 28 U.S.C.A. § 1331.

392 Cases that cite this headnote

**[9] Commerce**
🗝 Powers Remaining in States, and Limitations Thereon

Not every exercise of state authority imposing some burden on the free flow of commerce is invalid. U.S.C.A.Const. art. 1, § 8, cl. 3.

19 Cases that cite this headnote

**[10] Commerce**
🗝 Food products

Residuum of powers in state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce is particularly strong when state acts to protect its citizenry in matters pertaining to the sale of food stuffs. U.S.C.A.Const. art. 1, § 8, cl. 3.

24 Cases that cite this headnote

**[11] Commerce**
🗝 Food products

North Carolina statute which in effect prohibits the display of Washington State apple grades on closed containers shipped into the state violates commerce clause insofar as it prohibits the display of Washington State grades even if enacted for the declared purpose of protecting consumers from deception and fraud in the market place. U.S.C.A.Const. art. 1, § 8, cl. 3; G.S.N.C. § 106–189.1.

48 Cases that cite this headnote

**[12] Commerce**
🗝 Preferences and Discriminations

When discrimination against interstate commerce is demonstrated, burden falls on state to justify it both in terms of local benefits

Case 2:13-cv-08513-SJO-JC  Document 1  Filed 11/18/13  Page 55 of 64  Page ID #:57
Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333 (1977)
97 S.Ct. 2434, 53 L.Ed.2d 383

flowing from statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake. U.S.C.A.Const. art. 1, § 8, cl. 3.

135 Cases that cite this headnote

[13]    **Commerce**
          👉 Food products
          Burdens on commerce imposed by North Carolina statute which in effect prohibits the display of Washington State apple grades on closed containers shipped into state are not justified on ground that the standardization required by the statute serves the national interest in achieving uniformity in the grading and labeling of food stuffs. G.S.N.C. § 106–189.1.

65 Cases that cite this headnote

**2436   *333 Syllabus ***

Appellee, a statutory agency for the promotion and protection of the Washington State apple industry and composed of 13 state growers and dealers chosen from electoral districts by their fellow growers and dealers, all of whom by mandatory assessments finance appellees operations, brought this suit challenging the constitutionality of a North Carolina statute requiring that all apples sold or shipped into North Carolina in closed containers be identified by no grade on the container other than the applicable federal grade or a designation that the apples are not graded. A three-judge District Court granted the requested injunctive and declaratory relief, holding that appellee had standing to challenge the statute, that the $10,000 jurisdictional amount of 28 U.S.C. s 1331 was satisfied, and that the challenged statute unconstitutionally discriminated against commerce insofar as it affected the interstate shipment of Washington apples, Held:

1. Appellee has standing to bring this action in a representational capacity. Pp. 2440-2443.

(a) An association has standing to bring suit on behalf of its members when (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks

to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members. Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343. Pp. 2441-2442.

(b) The prerequisites to associational standing described in Warth are clearly present here: (1) At the risk of otherwise losing North Carolina accounts, some Washington apple growers and dealers had (at a per-container cost of 5¢ to 15¢) obliterated Washington State grades from the large volume of North Carolina-bound containers; and they had stopped using preprinted containers, thus diminishing the efficiency of their marketing operations; (2) appellee's attempt to remedy these injuries is central to its purpose of protecting and enhancing the Washington apple market; and (3) neither appellee's constitutional claim nor the relief requested requires individualized proof. Pp. 2441-2442.

*334 (c) Though appellee is a state agency, it is not on that account precluded from asserting the claims of the State's apple growers and dealers since for all practical purposes appellee performs the functions of a traditional trade association. While the apple growers are not "members" of appellee in the traditional trade association **2437 sense, they possess all the indicia of organization membership (viz., electing the members, being the only ones to serve on the Commission, and financing its activities), and it is of no consequence that membership assessments are mandatory. P. 2442.

(d) Appellee's own interests may be adversely affected by the outcome of this litigation, since the annual assessments that are used to support its activities and which are tied to the production of Washington apples could be reduced if the market for those apples declines as a result of the North Carolina statute. P. 2442.

2. The requirements of s 1331 are satisfied. Since appellee has standing to litigate its constituents' claims, it may rely on them to meet the requisite amount of $10,000 in controversy. And it does not appear "to a legal certainty" that the claims of at least some of the individual growers and dealers will not come to that amount in view of the substantial annual sales volume of Washington apples in North Carolina (over $2 million) and the continuing nature of the statute's interference with the Washington apple industry, coupled with the evidence in the record that growers and dealers have suffered and will continue to suffer losses of various types from the operation

Case 2:13-cv-09513-SJO-JC Document 1 Filed 11/18/13 Page 56 of 64 Page ID #:58
Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333 (1977)
97 S.Ct. 2434, 53 L.Ed.2d 383

of the challenged statute. St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845. Pp. 2443-2444.

3. The North Carolina statute violates the Commerce Clause by burdening and discriminating against the interstate sale of Washington apples. Pp. 2444-2447.

(a) The statute raises the costs of doing business in the North Carolina market for Washington growers and dealers while leaving unaffected their North Carolina counterparts, who were still free to market apples under the federal grade or none at all. Pp. 2445-2446.

(b) The statute strips the Washington apple industry of the competitive and economic advantages it has earned for itself by an expensive, stringent mandatory state inspection and grading system that exceeds federal requirements. By requiring Washington apples to be sold under the inferior grades of their federal counterparts, the North Carolina statute offers the North Carolina apple industry the very sort of protection against out-of-state competition that the Commerce Clause was designed to prohibit. Pp. 2445-2446.

*335 (c) Even if the statute was not intended to be discriminatory and was enacted for the declared purpose of protecting consumers from deception and fraud because of the multiplicity of state grades, the statute does remarkably little to further that goal, at least with respect to Washington apples and grades, for it permits marketing of apples in closed containers under no grades at all and does nothing to purify the flow of information at the retail level. Moreover, Washington grades could not have led to the type of deception at which the statute was assertedly aimed, since those grades equal or surpass the comparable federal standards. Pp. 2446-2447.

(d) Nondiscriminatory alternatives to the outright ban of Washington State grades are readily available. Pp. 2446-2447. 408 F.Supp. 857, affirmed.

## Attorneys and Law Firms

John R. Jordan, Jr., Raleigh, N. C., for appellants.

Slade Gorton, Atty. Gen., Olympia, Wash., for appellee.

## Opinion

Mr. Chief Justice BURGER delivered the opinion of the Court.

In 1973, North Carolina enacted a statute which required, inter alia, all closed containers of apples sold, offered for sale, or shipped into the State to bear "no grade other than the applicable U.S. grade or standard." N.C.Gen.Stat. s 106-189.1 (1973). In an action brought by the Washington State Apple Advertising Commission, a three-judge Federal District Court invalidated the statute insofar as it prohibited the display of Washington State apple grades on the ground that it unconstitutionally discriminated against interstate commerce.

*336 **2438 The specific questions presented on appeal are (a) whether the Commission had standing to bring this action; (b) if so, whether it satisfied the jurisdictional-amount requirement of 28 U.S.C. s 1331;[1] and (c) whether the challenged North Carolina statute constitutes an unconstitutional burden on interstate commerce.

### (1)

Washington State is the Nation's largest producer of apples, its crops accounting for approximately 30% of all apples grown domestically and nearly half of all apples shipped in closed containers in interstate commerce. As might be expected, the production and sale of apples on this scale is a multimillion dollar enterprise which plays a significant role in Washington's economy. Because of the importance of the apple industry to the State, its legislature has undertaken to protect and enhance the reputation of Washington apples by establishing a stringent, mandatory inspection program, administered by the State's Department of Agriculture, which requires all apples shipped in interstate commerce to be tested under strict quality standards and graded accordingly. In all cases, the Washington State grades, which have gained substantial acceptance in the trade, are the equivalent of, or superior to, the comparable grades and standards adopted by the United States Department of Agriculture (USDA). Compliance with the Washington inspection scheme costs the State's growers approximately $1 million each year.

In addition to the inspection program, the state legislature has sought to enhance the market for Washington apples through the creation of a state agency, the Washington State Apple Advertising Commission, charged with the

statutory **\*337** duty of promoting and protecting the State's apple industry. The Commission itself is composed of 13 Washington apple growers and dealers who are nominated and elected within electoral districts by their fellow growers and dealers. Wash.Rev.Code ss 15.24.020, 15.24.030 (1974). Among its activities are the promotion of Washington apples in both domestic and foreign markets through advertising, market research and analysis, and public education, as well as scientific research into the uses, development, and improvement of apples. Its activities are financed entirely by assessments levied upon the apple industry, s 15.24.100; in the year during which this litigation began, these assessments totaled approximately $1.75 million. The assessments, while initially fixed by statute, can be increased only upon the majority vote of the apple growers themselves. s 15.24.090.

In 1972, the North Carolina Board of Agriculture adopted an administrative regulation, unique in the 50 States, which in effect required all closed containers of apples shipped into or sold in the State to display either the applicable USDA grade or none at all. State grades were expressly prohibited. [2] In addition to its obvious consequence prohibiting the display of Washington State apple grades on containers of apples shipped into North Carolina, the regulation presented the Washington apply industry with a marketing problem of potentially nationwide significance. Washington apple growers annually ship in commerce approximately 40 million closed containers of apples, nearly 500,000 of which eventually find their way into North Carolina, stamped with the applicable Washington State variety **\*338** and grade. It is the industry's practice to purchase these containers preprinted with the various apple varieties **\*\*2439** and grades, prior to harvest. After these containers are filled with apples of the appropriate type and grade, a substantial portion of them are placed in cold-storage warehouses where the grade labels identify the product and facilitate its handling. These apples are then shipped as needed throughout the year; after February 1 of each year, they constitute approximately two-thirds of all apples sold in fresh markets in this country. Since the ultimate destination of these apples is unknown at the time they are placed in storage, compliance with North Carolina's unique regulation would have required Washington growers to obliterate the printed labels on containers shipped to North Carolina, thus giving their product a damaged appearance. Alternatively, they could have changed their marketing practices to accommodate the needs of the North Carolina market, i. e., repack apples to be shipped to North Carolina in containers bearing only the USDA grade, and/or store the estimated portion of the harvest destined for that market

in such special containers. As a last resort, they could discontinue the use of the preprinted containers entirely. None of these costly and less efficient options was very attractive to the industry. Moreover, in the event a number of other States followed North Carolina's lead, the resultant inability to display the Washington grades could force the Washington growers to abandon the State's expensive inspection and grading system which their customers had come to know and rely on over the 60-odd years of its existence.

With these problems confronting the industry, the Washington State Apple Advertising Commission petitioned the North Carolina Board of Agriculture to amend its regulation to permit the display of state grades. An administrative hearing was held on the question but no relief was granted. **\*339** Indeed, North Carolina hardened its position shortly thereafter by enacting the regulation into law: "All apples sold offered for sale, or shipped into this State in closed containers shall bear on the container, bag or other receptacle, no grade other than the applicable U.S. grade or standard or the marking 'unclassified,' 'not graded' or 'grade not determined.' " N.C.Gen.Stat. s 106-189.1 (1973).

Nonetheless, the Commission once again requested an exemption which would have permitted the Washington apple growers to display both the United States and the Washington State grades on their shipments to North Carolina. This request, too, was denied.

Unsuccessful in its attempts to secure administrative relief, the Commission [3] instituted this action challenging the constitutionality of the statute in the United States District Court for the Eastern District of North Carolina. Its complaint, which invoked the District Court's jurisdiction under 28 U.S.C. ss 1331 and 1343, sought a declaration that the statute violated, inter alia, the Commerce Clause of the United States Constitution, Art. I, s 8, cl. 3, insofar as it prohibited the display of Washington State grades, and prayed for a permanent injunction against its enforcement in this manner. A three-judge Federal District Court was convened pursuant to 28 U.S.C. ss 2281 and 2284 to consider the Commission's constitutional attack on the statute.

After a hearing, the District Court granted the requested relief. 408 F.Supp. 857 (1976). At the outset, it held that the Commission had standing to challenge the statute both in its own right and on behalf of the Washington State growers and dealers, and that the $10,000 amount-in-controversy **\*340** requirement of s 1331 had been satisfied. [4] **\*\*2440**

Case 2:13-cv-08513-SJO-JC Document 1 Filed 11/18/13 Page 58 of 64 Page ID #:60
Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333 (1977)
97 S.Ct. 2434, 53 L.Ed.2d 383

408 F.Supp., at 858. Proceeding to the merits, the District Court found that the North Carolina statute, while neutral on its face, actually discriminated against Washington State growers and dealers in favor of their local counterparts. Id., at 860-861. This discrimination resulted from the fact that North Carolina, unlike Washington, had never established a grading and inspection system. Hence, the statute had no effect on the existing practices of North Carolina producers; they were still free to use the USDA grade or none at all. Washington growers and dealers, on the other hand, were forced to alter their long-established procedures, at substantial cost, or abandon the North Carolina market. The District Court then concluded that this discrimination against out-of-state competitors was not justified by the asserted local interest the elimination of deception and confusion from the marketplace arguably furthered by the statute. Indeed, it noted that the statute was "irrationally" drawn to accomplish that alleged goal since it permitted the marketing of closed containers of apples without any grade at all. Id., at 861-862. The court therefore held that the statute unconstitutionally discriminated against commerce, insofar as it affected the interstate shipment of Washington apples, [5] and enjoined its application. This appeal followed and we postponed further consideration of the question of jurisdiction to the hearing of the case on the **341** merits sub nom. Holshouser v. Washington State Apple Advertising Comm'n, 429 U.S. 814, 97 S.Ct. 54, 50 L.Ed.2d 73 (1976).

**(2)**

In this Court, as before, the North Carolina officials vigorously contest the Washington Commission's standing to prosecute this action, either in its own right, or on behalf of that State's apple industry which it purports to represent. At the outset, appellants maintain that the Commission lacks the "personal stake" in the outcome of this litigation essential to its invocation of federal-court jurisdiction. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The Commission, they point out, is a state agency, not itself engaged in the production and sale of Washington apples or their shipment into North Carolina. Rather, its North Carolina activities are limited to the promotion of Washington apples in that market through advertising. [6] Appellants contend that the challenged statute has no impact on that activity since it prohibits only the display of state apple grades on closed containers of apples. Indeed, since the statute imposed no restrictions on the advertisement of Washington apples or grades other than the labeling ban, which affects only those parties actually engaged in the apple trade, the Commission

is said to be free to carry on the same activities that it engaged in prior to the regulatory program. Appellants therefore argue that the Commission suffers no injury, economic or otherwise, from the statute's operation, and, as a result, cannot make out the "case or controversy" between itself and the appellants needed to establish standing in the constitutional sense. E. g., Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 260-264, 97 S.Ct. 555, 561-563, 50 L.Ed.2d 450 (1977); Warth v. Seldin, 422 U.S. 490, 498-499, 95 S.Ct. 2197, 2204-2205, 45 L.Ed.2d 343 (1975).

[1] Moreover, appellants assert, the Commission cannot rely on **342** the injuries which the statute allegedly inflicts individually or collectively on Washington apple growers and dealers in order to confer **2441** standing on itself. Those growers and dealers, appellants argue, are under no disabilities which prevent them from coming forward to protect their own rights if they are, in fact, injured by the statute's operation. In any event, appellants contend that the Commission is not a proper representative of industry interests. Although this Court has recognized that an association may have standing to assert the claims of its members even where it has suffered no injury from the challenged activity, e. g., Warth v. Seldin, supra, at 511, 95 S.Ct., at 2211; National Motor Freight Traffic Association v. United States, 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963), the Commission is not a traditional voluntary membership organization such as a trade association, for it has no members at all. Thus, since the Commission has no members whose claims it might raise, and since it has suffered no "distinct and palpable injury" to itself, it can assert no more than an abstract concern for the well-being of the Washington apple industry as the basis for its standing. That type of interest, appellants argue, cannot "substitute for the concrete injury required by Art. III." Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976).

[2] If the Commission were a voluntary membership organization a typical trade association its standing to bring this action as the representative of its constituents would be clear under prior decisions of this Court. In Warth v. Seldin, supra, we stated:

"Even in the absence of injury to itself, an association may have standing solely as the representative of its members. . . . The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. . . .

Case 2:13-cv-98513-SJO-JC Document 1 Filed 11/18/13 Page 59 of 64 Page ID #:61
Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333 (1977)
97 S.Ct. 2434, 53 L.Ed.2d 383

So long as this can be established, and so long as the nature of the claim and *343 of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." 422 U.S., at 511, 95 S.Ct., at 2212.

See also Simon v. Eastern Ky. Welfare Rights Org., supra, at 39-40, 96 S.Ct., at 1925; Meek v. Pittenger, 421 U.S. 349, 355-356 n. 5, 95 S.Ct. 1753, 1758, 44 L.Ed.2d 217 (1975); Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972); National Motor Freight Ass'n v. United States, supra. We went on in Warth to elaborate on the type of relief that an association could properly pursue on behalf of its members:

"(W)hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind." 422 U.S., at 515, 95 S.Ct., at 2213.

Thus we have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

[3] [4] The prerequisites to "associational standing" described in Warth are clearly present here. The Commission's complaint alleged, and the District Court found as a fact, that the North Carolina statute had caused some Washington apple growers and dealers (a) to obliterate Washington State grades from the *344 large volume of closed containers destined for the North Carolina **2442 market at a cost ranging from 5 to 15 cents per carton; (b) to abandon the use of preprinted containers, thus diminishing the efficiency of their marketing operations; or (c) to lose accounts in North Carolina. Such injuries are direct and sufficient to establish the requisite "case or controversy" between Washington apple producers and appellants. Moreover, the Commission's attempt to remedy

these injuries and to secure the industry's right to publicize its grading system is central to the Commission's purpose of protecting and enhancing the market for Washington apples. Finally, neither the interstate commerce claim nor the request for declaratory and injunctive relief requires individualized proof and both are thus properly resolved in a group context.

[5] The only question presented, therefore, is whether, on this record, the Commission's status as a state agency, rather than a traditional voluntary membership organization, precludes it from asserting the claims of the Washington apple growers and dealers who form its constituency. We think not. The Commission, while admittedly a state agency, for all practical purposes, performs the functions of a traditional trade association representing the Washington apple industry. As previously noted, its purpose is the protection and promotion of the Washington apple industry; and, in the pursuit of that end, it has engaged in advertising, market research and analysis, public education campaigns, and scientific research. It thus serves a specialized segment of the State's economic community which is the primary beneficiary of its activities, including the prosecution of this kind of litigation.

Moreover, while the apple growers and dealers are not "members" of the Commission in the traditional trade association sense, they possess all of the indicia of membership in an organization. They alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, *345 through assessments levied upon them. In a very real sense, therefore, the Commission represents the State's growers and dealers and provides the means by which they express their collective views and protect their collective interests. Nor do we find it significant in determining whether the Commission may properly represent its constituency that "membership" is "compelled" in the form of mandatory assessments. Membership in a union, or its equivalent, is often required. Likewise, membership in a bar association, which may also be an agency of the State, is often a prerequisite to the practice of law. Yet in neither instance would it be reasonable to suggest that such an organization lacked standing to assert the claims of its constituents.

Finally, we note that the interests of the Commission itself may be adversely affected by the outcome of this litigation. The annual assessments paid to the Commission are tied to the volume of apples grown and packaged as "Washington Apples." In the event the North Carolina statute results in a

contraction of the market for Washington apples or prevents any market expansion that might otherwise occur, it could reduce the amount of the assessments due the Commission and used to support is activities. This financial nexus between the interests of the Commission and its constituents coalesces with the other factors noted above to "assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Baker v. Carr, 369 U.S., at 204, 82 S.Ct., at 703; see also NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 459-460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958).

Under the circumstances presented here, it would exalt form over substance to differentiate between the Washington Commission and a traditional trade association representing the individual growers and dealers who collectively form its constituency. We therefore agree with the District Court that the Commission has standing to bring this action in a representational capacity.

**\*346  \*\*2443  (3)**

We turn next to the appellants' claim that the Commission has failed to satisfy the $10,000 amount-in-controversy requirement of 28 U.S.C. s 1331. As to this, the appellants maintain that the Commission itself has not demonstrated that its right to be free of the restrictions imposed by the challenged statute is worth more than the requisite $10,000. Indeed, they argue that the Commission has made no real effort to do so, but has instead attempted to rely on the actual and threatened injury to the individual Washington apple growers and dealers upon whom the statute has a direct impact. This, they claim, it cannot do, for those growers and dealers are not parties to this litigation. Alternatively, appellants argue that even if the Commission can properly rely on the claims of the individual growers and dealers, it cannot establish the required jurisdictional amount without aggregating those claims. Such aggregation, they argue, is impermissible under this Court's decisions in Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), and Zahn v. International Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973).

[6]  Our determination that the Commission has standing to assert the rights of the individual growers and dealers in a representational capacity disposes of the appellants' first contention. Obviously, if the Commission has standing to litigate the claims of its constituents, it may also rely on them to meet the requisite amount in controversy. Hence,

we proceed to the question of whether those claims were sufficient to confer subject-matter jurisdiction on the District Court. In resolving this issue, we have found it unnecessary to reach the aggregation question posed by the appellants for it does not appear to us "to a legal certainty" that the claims of at least some of the individual growers and dealers will not amount to the required $10,000. St. Paul Mercury Indemnity Co. v. Red Cab. Co., 303 U.S. 283, 288-289, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938).

[7]  **\*347**  In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation. E. g., McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 181, 56 S.Ct. 780, 781, 80 L.Ed. 1135 (1936); Glenwood Light & Water Co. v. Mutual Light, Heat & Power Co., 239 U.S. 121, 126, 36 S.Ct. 30, 32, 60 L.Ed. 174 (1915); Hunt v. New York Cotton Exchange, 205 U.S. 322, 336, 27 S.Ct. 529, 533, 51 L.Ed. 821 (1907); 1 J. Moore, Federal Practice PP 0.95, 0.96 (2d ed. 1975); C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure s 3708 (1976). Here, that object is the right of the individual Washington apple growers and dealers to conduct their business affairs in the North Carolina market free from the interference of the challenged statute. The value of that right is measured by the losses that will follow from the statute's enforcement. McNutt, supra, at 181, 56 S.Ct., at 781; Buck v. Gallagher, 307 U.S. 95, 100, 59 S.Ct. 740, 742, 83 L.Ed. 1128 (1939); Kroger Grocery & Baking Co. v. Lutz, 299 U.S. 300, 301, 57 S.Ct. 215, 81 L.Ed. 251 (1936); Packard v. Banton, 264 U.S. 140, 142, 44 S.Ct. 257, 258, 68 L.Ed. 596 (1924).

Here the record demonstrates that the growers and dealers have suffered and will continue to suffer losses of various types. For example, there is evidence supporting the District Court's finding that individual growers and shippers lost accounts in North Carolina as a direct result of the statute. Obviously, those lost sales could lead to diminished profits. There is also evidence to support the finding that individual growers and dealers incurred substantial costs in complying with the statute. As previously noted, the statute caused some growers and dealers to manually obliterate the Washington grades from closed containers to be shipped to North Carolina at a cost of from 5 to 15 cents per carton. Other dealers decided to alter their marketing practices, not without cost, by repacking apples or abandoning the use of preprinted containers entirely, among other things. Such costs of **\*\*2444**  compliance are properly considered in computing the amount in controversy. Buck v. Gallagher, supra; Packard

Case 2:13-cv-08813-SJO-JC Document 1 Filed 11/18/13 Page 61 of 64 Page ID #:63
Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333 (1977)
97 S.Ct. 2434, 53 L.Ed.2d 383

v. Banton, supra; *348 Allway Taxi, Inc. v. City of New York, 340 F.Supp. 1120 S.D.N.Y.), aff'd, 468 F.2d 624 (CA2 1972). In addition, the statute deprived the growers and dealers of their rights to utilize most effectively the Washington State grades which, the record demonstrates, were of long standing and had gained wide acceptance in the trade. The competitive advantages thus lost could not be regained without incurring additional costs in the form of advertising, etc. Cf. Spock v. David, 502 F.2d 953, 956 (CA3 1974), rev'd on other grounds, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). Moreover, since many apples eventually shipped to North Carolina will have already gone through the expensive inspection and grading procedure, the challenged statute will have the additional effect of causing growers and dealers to incur inspection costs unnecessarily.

[8] Both the substantial volume of sales in North Carolina the record demonstrates that in 1974 alone, such sales were in excess of $2 million [7] and the continuing nature of the statute's interference with the business affairs of the Commission's constituents, preclude our saying "to a legal certainty," on this record, that such losses and expenses will not, over time, if they have not done so already, amount to the requisite $10,000 for at least some of the individual growers and dealers. That is sufficient to sustain the District Court's jurisdiction. The requirements of s 1331 are therefore met.

(4)

We turn finally to the appellants' claim that the District Court erred in holding that the North Carolina statute violated the Commerce Clause insofar as it prohibited the display of Washington State grades on closed containers of apples shipped into the State. Appellants do not really contest the District Court's determination that the challenged statute burdened the Washington apple industry by increasing its *349 costs of doing business in the North Carolina market and causing it to lose accounts there. Rather, they maintain that any such burdens on the interstate sale of Washington apples were far outweighed by the local benefits flowing from what they contend was a valid exercise of North Carolina's inherent police powers designed to protect its citizenry from fraud and deception in the marketing of apples.

Prior to the statute's enactment, appellants point out, apples from 13 different States were shipped into North Carolina for sale. Seven of those States, including the State of Washington, had their own grading systems which, while differing in their standards, used similar descriptive labels (e. g., fancy, extra

fancy, etc.). This multiplicity of inconsistent state grades, as the District Court itself found, posed dangers of deception and confusion not only in the North Carolina market, but in the Nation as a whole. The North Carolina statute, appellants claim, was enacted to eliminate this source of deception and confusion by replacing the numerous state grades with a single uniform standard. Moreover, it is contended that North Carolina sought to accomplish this goal of uniformity in an evenhanded manner as evidenced by the fact that its statute applies to all apples sold in closed containers in the State without regard to their point of origin. Nonetheless, appellants argue that the District Court gave "scant attention" to the obvious benefits flowing from the challenged legislation and to the long line of decisions from this Court holding that the States possess "broad powers" to protect local purchasers from fraud and deception in the marketing of foodstuffs. E. g., Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); **2445 Pacific States Box & Basket Co. v. White, 296 U.S. 176, 56 S.Ct. 159, 80 L.Ed. 138 (1935); Corn Products Refining Co. v. Eddy, 249 U.S. 427, 39 S.Ct. 325, 63 L.Ed. 689 (1919).

[9] [10] As the appellants properly point out, not every exercise of state authority imposing some burden on the free flow of commerce is invalid. E. g., *350 Great Atlantic & Pacific Tea Co. v. Cottrell, 424 U.S. 366, 371, 96 S.Ct. 923, 928, 47 L.Ed.2d 55 (1976); Freeman v. Hewit, 329 U.S. 249, 252, 67 S.Ct. 274, 276, 91 L.Ed. 265 (1946). Although the Commerce Clause acts as a limitation upon state power even without congressional implementation, e. g., Great Atlantic & Pacific Tea Co., supra, 424 U.S. at 370-371, 96 S.Ct., at 927-928; Freeman v. Hewit, supra, 329 U.S. at 252, 67 S.Ct., at 276; Cooley v. Board of Wardens, 12 How. 299, 13 L.Ed. 996 (1852), our opinions have long recognized that, "in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." Southern Pacific Co. v. Arizona, ex rel. Sullivan, 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945).

Moreover, as appellants correctly note, that "residuum" is particularly strong when the State acts to protect its citizenry in matters pertaining to the sale of foodstuffs. Florida Lime & Avocado Growers, Inc., supra, 373 U.S. at 146, 83 S.Ct., at 1219. By the same token, however, a finding that state legislation furthers matters of legitimate local concern, even in the health and consumer protection areas, does not end the inquiry. Such a view, we have noted, "would mean that the Commerce Clause of itself imposes no limitations on state

97 S.Ct. 2434, 53 L.Ed.2d 383

action . . . save for the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods." Dean Milk Co. v. Madison, 340 U.S. 349, 354, 71 S.Ct. 295, 298, 95 L.Ed. 329 (1951). Rather, when such state legislation comes into conflict with the Commerce Clause's overriding requirement of a national "common market," we are confronted with the task of effecting an accommodation of the competing national and local interests. Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970); Great Atlantic & Pacific Tea Co., supra, 424 U.S. at 370-372, 96 S.Ct., at 927-928. We turn to that task.

As the District Court correctly found, the challenged statute has the practical effect of not only burdening interstate sales of Washington apples, but also discriminating against them. This discrimination takes various forms. The first, and most *351 obvious, is the statute's consequence of raising the costs of doing business in the North Carolina market for Washington apple growers and dealers, while leaving those of their North Carolina counterparts unaffected. As previously noted, this disparate effect results from the fact that North Carolina apple producers, unlike their Washington competitors, were not forced to alter their marketing practices in order to comply with the statute. They were still free to market their wares under the USDA grade or none at all as they had done prior to the statute's enactment. Obviously, the increased costs imposed by the statute would tend to shield the local apple industry from the competition of Washington apple growers and dealers who are already at a competitive disadvantage because of their great distance from the North Carolina market.

Second, the statute has the effect of stripping away from the Washington apple industry the competitive and economic advantages it has earned for itself through its expensive inspection and grading system. The record demonstrates that the Washington apple-grading system has gained nationwide acceptance in the apple trade. Indeed, it contains numerous affidavits from apple brokers and dealers located both inside and outside of North Carolina who state their preference, and that of their customers, for apples graded under the Washington, as opposed to the USDA, system because of the former's greater consistency, **2446 its emphasis on color, and its supporting mandatory inspections. Once again, the statute had no similar impact on the North Carolina apple industry and thus operated to its benefit.

Third, by prohibiting Washington growers and dealers from marketing apples under their State's grades, the statute has a

leveling effect which insidiously operates to the advantage of local apple producers. As noted earlier, the Washington State grades are equal or superior to the USDA grades in all corresponding categories. Hence, with free market forces at *352 work, Washington sellers would normally enjoy a distinct market advantage vis-a-vis local producers in those categories where the Washington grade is superior. However, because of the statute's operation, Washington apples which would otherwise qualify for and be sold under the superior Washington grades will now have to be marketed under their inferior USDA counterparts. Such "downgrading" offers the North Carolina apple industry the very sort of protection against competing out-of-state products that the Commerce Clause was designed to prohibit. At worst, it will have the effect of an embargo against those Washington apples in the superior grades as Washington dealers withhold them from the North Carolina market. At best, it will deprive Washington sellers of the market premium that such apples would otherwise command.

[11]    Despite the statute's facial neutrality, the Commission suggests that its discriminatory impact on interstate commerce was not an unintended byproduct and there are some indications in the record to that effect. The most glaring is the response of the North Carolina Agriculture Commissioner to the Commission's request for an exemption following the statue's passage in which he indicated that before he could support such an exemption, he would "want to have the sentiment from our apple producers since they were mainly responsible for this legislation being passed . . . ." App. 21 (emphasis added). Moreover, we find it somewhat suspect that North Carolina singled out only closed containers of apples, the very means by which apples are transported in commerce, to effectuate the statute's ostensible consumer protection purpose when apples are not generally sold at retail in their shipping containers. However, we need not ascribe an economic protection motive to the North Carolina Legislature to resolve this case; we conclude that the challenged statute cannot stand insofar as it prohibits the *353 display of Washington State grades even if enacted for the declared purpose of protecting consumers from deception and fraud in the marketplace.

[12]    When discrimination against commerce of the type we have found is demonstrated, the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake. Dean Milk Co. v. Madison, 340 U.S. at 354, 71 S.Ct., at 297. See also Great Atlantic & Pacific Tea Co., 424 U.S., at 373, 96

S.Ct., at 929; Pike v. Bruce Church, Inc., 397 U.S., at 142, 90 S.Ct., at 847; Polar Ice Cream & Creamery Co. v. Andrews, 375 U.S. 361, 375 n.9, 84 S.Ct. 378, 386, 11 L.Ed.2d 389 (1964); Baldwin v. G. A. F. Seelig, Inc., 294 U.S. 511, 524, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (1935). North Carolina has failed to sustain that burden on both scores.

The several States unquestionably possess a substantial interest in protecting their citizens from confusion and deception in the marketing of foodstuffs, but the challenged statute does remarkably little to further that laudable goal at least with respect to Washington apples and grades. The statute, as already noted, permits the marketing of closed containers of apples under no grades at all. Such a result can hardly be thought to eliminate the problems of deception and confusion created by the multiplicity of differing state grades; indeed, it magnifies them by depriving purchasers of all information concerning the quality of the contents of closed apple containers. Moreover, **2447 although the statute is ostensibly a consumer protection measure, it directs its primary efforts, not at the consuming public at large, but at apple wholesalers and brokers who are the principal purchasers of closed containers of apples. And those individuals are presumably the most knowledgeable individuals in this area. Since the statute does nothing at all to purify the flow of information at the retail level, it does little to protect consumers against the problems it was designed to eliminate. Finally, we note that any potential *354 for confusion and deception created by the Washington grades [8] was not of the type that led to the statute's enactment. Since Washington grades are in all cases equal or superior to their USDA counterparts, they could only "deceive" or "confuse" a consumer to his benefit, hardly a harmful result.

 [13]    In addition, it appears that nondiscrimnatory alternatives to the outright ban of Washington State grades are readily available. For example, North Carolina could effectuate its goal by permitting out-of-state growers to utilize state grades only if they also marked their shipments with the applicable USDA label. In that case, the USDA grand would serve as a benchmark against which the consumer could evaluate the quality of the various state grades. If this alternative was for some reason inadequate to eradicate problems caused by state grades inferior to those adopted by the USDA, North Carolina might consider banning those state grades which, unlike Washington's could not be demonstrated to be equal or superior to the corresponding USDA categories. Concededly, even in this latter instance, some potential for "confusion" might persist. However, it is the type of "confusion" that the national interest in the free flow of goods between the States demands be tolerated. [9]

The judgment of the District Court is

Affirmed.

Mr. Justice REHNQUIST took no part in the consideration or decision of the case.

### Parallel Citations

97 S.Ct. 2434, 53 L.Ed.2d 383

Footnotes

*       The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1       Section 1331 provides in pertinent part:
        "(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs . . . ."

2       The North Carolina regulation, as amended, provides in pertinent part:
        "(6) Apple containers must show the applicable U.S. Grade on the principal display panel or marked 'Unclassified,' 'Not Graded,' or 'Grade Not Determined.' State grades shall not be shown." s 3-24.5(6), Rules, Regulations, Definitions and Standards of the North Carolina Department of Agriculture.

3       Under Washington law, the Commission is a corporation and is specifically granted the power to sue and be sued. Wash.Rev.Code s 15.24.070(8) (1974).

4       In this regard, it adopted the ruling of the single District Judge who had previously denied appellants' motion to dismiss the complaint brought on the same grounds. App. 51-58. That judge had found it unnecessary to determine whether jurisdiction was also proper under 28 U.S.C. s 1343 in view of his determination that jurisdiction had been established under s 1331. App. 57 n. 2.

Case 2:13-cv-08513-SJO-JC   Document 1   Filed 11/18/13   Page 64 of 64   Page ID #:66
Hunt v. Washington State Apple Advertising Com'n, 432 U.S. 333 (1977)
97 S.Ct. 2434, 53 L.Ed.2d 383

5     As an alternative ground for its holding, the District Court found that the statute would have constituted an undue burden on commerce even if it had been neutral and nondiscriminatory in its impact. Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). 408 F.Supp., at 862 n. 9.

6     During 1974, the Commission spent in excess of $25,000 advertising Washington apples in the North Carolina market. Id., at 859.

7     In addition, apples worth approximately 30 to 40 percent of that amount were transshipped into North Carolina in 1974 after direct shipment to apple brokers and wholesalers located in other States.

8     Indeed, the District Court specifically indicated in its findings of fact that there had been no showing that the Washington State grades had caused any confusion in the North Carolina market. 408 F.Supp., at 859.

9     Our conclusion in this regard necessarily rejects North Carolina's suggestion that the burdens on commerce imposed by the statute are justified on the ground that the standardization required by the statute serves the national interest in achieving uniformity in the grading and labeling of foodstuffs.

---

**End of Document**                                                  © 2013 Thomson Reuters. No claim to original U.S. Government Works.